# FOR PUBLICATION



ATTORNEYS FOR APPELLANT:

**CHARLES R. SHEDLAK**
Shedlak & Benchik Law Firm LLP
South Bend, Indiana

**GEORGE M. FERRETI**
Foran Glennon Palandech Ponzi & Rudloff, PC
Chicago, Illinois

ATTORNEYS FOR APPELLEE:

**MARK D. GERTH**
**MICHAEL WROBLEWSKI**
Kightlinger & Gray, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| LBM REALTY, LLC, d/b/a SUMMER PLACE APARTMENTS, an Indiana Corporation | ) ) ) ) | |
| Appellant/Plaintiff, | ) ) | |
| vs. | ) ) | No. 71A03-1402-PL-66 |
| HILLARY MANNIA, an Indiana resident, | ) ) | |
| Appellee/Defendant. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable David C. Chapleau, Judge
Cause No. 71D06-1105-PL-00110

**October 28, 2014**

**OPINION – FOR PUBLICATION**

**VAIDIK, Chief Judge**

**Case Summary**

Following a fire in an apartment building owned by LBM Realty LLC d/b/a Summer Place Apartments (LBM), LBM's insurance company Greater New York Mutual Insurance Company (Insurer) filed an insurance subrogation action in LBM's name against LBM's tenant, Hillary Mannia. Mannia filed for summary judgment, urging the trial court to adopt a no-subrogation rule—citing *Sutton v. Jondahl*, 532 P.2d 478 (Okla. Ct. App. 1975), and its progeny as support—which would preclude LBM's complaint against her. The trial court granted summary judgment in favor of Mannia, and LBM now appeals. We find that Indiana law supports a largely case-by-case approach to subrogation actions by a landlord's insurer against a tenant and, therefore, does not preclude LBM from pursuing its claims against Mannia, at least with respect to damage to the leased premises. Accordingly, we affirm in part, reverse in part, and remand with instructions.

**Facts and Procedural History**

In July 2010, a fire—resulting in $743,402.86 in damages—occurred at Summer Place Apartments (the Apartments), an apartment complex in Granger, Indiana, owned by LBM. Appellant's App. p. 3. Mannia was a tenant in the Apartments, having signed a one-year lease in March 2010.[1] Included within the lease are several relevant lease provisions, which we have condensed and paraphrased below:

- A provision titled "Insurance," which is silent as to LBM's obligation to maintain property insurance, but states in bold type: "Owner recommends the Resident obtain renter's insurance." This provision also states that in the event the leased premises are totally destroyed by some cause beyond the owner's control, the lease will terminate as of that date (and to the extent that the premises are only partially destroyed, there will be an abatement in rent).

---

[1] Debra Mannia also signed the Lease, as "CoHead of House" (whereas Mannia was "Head of House"). Appellant's App. p. 11.

- A provision titled "Rules," which incorporates an attached list of "Rules and Regulations" into the lease, the most relevant of which reads as follows:

    > 7. Resident must pay repair costs for all damages to Resident's Apartment, Apartment Community facilities, and common areas caused by Resident or members of Resident's household or guests. . . . .

- A "Save Harmless Clause," which states: "Resident shall indemnify and save harmless Owner from and against any and all claims or actions for damages to persons or property," including claims in which it is asserted that Owner has been negligent.

- A provision stating that "'Premises' shall mean only that portion of Owner's property contained within the interior walls of the dwelling unit described herein . . . ."

- Within "Miscellaneous Provisions":

    > At the end of the term, Resident shall return the Leased Premises to Owner in the same good condition, reasonable wear and tear excepted. Resident is and shall be responsible and liable for any injury or damage done to the Leased Premises, common areas or any property of Owner caused by [R]esident, any occupant, or any other person whom Resident permits to be in or about the Leased Premises.

This section also states, "Resident shall permit no waste[2] of the Leased Premises nor allow the same to be done, but Resident shall take good care of the same . . . ."

*See id.* at 5-14.

---

2 "Waste" is defined, in relevant part, as:

A. The occurrence or threat of physical damage to the Premises, common areas, or other property of Owner;

B. The occurrence or threat of . . . damage to the property of . . . other persons lawfully in the Leased Premises, common areas, other living units, or other property of Owner . . . .

\* \* \* \* \*

E. Other acts or omissions which are or may be likely to cause damage or injury to . . . Owner's property . . . .

After the fire at the Apartments, Insurer filed a subrogation action in LBM's name against Mannia, alleging in its complaint that Mannia was in breach of contract and negligent. *Id.* at 1-4. Specifically, the complaint states that Mannia breached her contract with LBM in "one or more of the following ways":

(1) Carelessly and improperly disposed of smoking materials by placing same in a plastic bottle and in close proximity to the vinyl siding on the balcony patio wall of the leased premises; and/or

(2) Carelessly and improperly allowed guests to dispose of smoking materials by placing same in a plastic bottle and in close proximity to the vinyl siding on the balcony patio wall of the leased premises[;] and/or

(3) Otherwise failed to comply with her obligation to return the premises in the same condition as when she moved in, reasonable wear and tear excepted.

*Id.* at 2. In regard to its negligence claim, LBM repeated (1) and (2) above, and also alleged that Mannia had "otherwise acted carelessly and negligently." *Id.* at 3.

Mannia filed a motion to dismiss LBM's complaint. In her brief in support of the motion, Mannia discussed the three different approaches used by courts around the country to address subrogation claims of landlords' insurers against negligent tenants. *See id.* at 25-27. These approaches include:

(1) the no-subrogation (or implied co-insured) approach (i.e., the "*Sutton* rule"), in which, absent an express agreement to the contrary, a landlord's insurer is precluded from filing a subrogation claim against a negligent tenant because the tenant is presumed to be a co-insured under the landlord's insurance policy; (2) the pro-subrogation approach, in which, absent an express term to the contrary, a landlord's insurer is allowed to bring a subrogation claim against a negligent tenant; and (3) the case-by-case approach, in which courts determine the availability of subrogation based on the reasonable expectations of the parties under the facts of each case.

*See LBM Realty, LLC v. Mannia*, 981 N.E.2d 569, 573 (Ind. Ct. App. 2012) (internal footnotes omitted). Mannia then argued that the trial court should adopt the first

4

approach—the no-subrogation/implied co-insured rule articulated in the Oklahoma case of *Sutton v. Jondahl*, 532 P.2d 478, otherwise known as the *Sutton* rule—and dismiss LBM's complaint. *Id*. The trial court agreed—adopting this rule and then applying it—and granted Mannia's motion to dismiss, concluding that LBM was precluded from pursuing its subrogation claims because Mannia was an "additional insured" under LBM's insurance policy. *Id.* at 576.

LBM appealed, and this Court reversed and remanded, without adopting either approach:

> Despite the current state of Indiana law that permits insurers to bring a subrogation claim against a tenant, the trial court did not test LBM's complaint against the backdrop of the law as it existed. Instead, the trial court adopted the no-subrogation approach, thereby precluding LMB's claims against Mannia. It seems that the trial court put the proverbial cart before the horse by first adopting a rule precluding subrogation claims against tenants and then reviewing LBM's complaint in light of that newly adopted rule.
>
> Whether the no-subrogation approach, pro-subrogation approach, or case-by-case approach should be adopted in this State is a matter we leave for another day as the facts in this case are limited at this juncture of the proceedings and have not been developed enough to enable a meaningful review of the issue. Because Indiana law does not currently preclude a landlord's insurer from bringing a subrogation claim against a tenant and because the allegations in LBM's complaint establish a set of circumstances under which it would be entitled to relief, LBM's complaint states claims upon which relief could be granted.

*Id.* at 578.

Thereafter, further discovery occurred, and the parties agreed to the following Stipulations:

1. The money received from rent (including [] Mannia's rent from March 25, 2010[,] to July 3, 2010) was used to pay LBM []'s operating expenses, including but not limited to procurement and maintenance of insurance covering the apartment complex at 825 Summer Place Lane, Granger,

Indiana, 46530 and all units included therein. However, [LBM]'s property insurance did not provide coverage to any of the belongings owned by [] Mannia.

2. Furthermore, pursuant to the terms of the insurance policy that LBM [] obtained, LBM []'s insurer has asserted a right of subrogation as to the claims asserted by [LBM] against [] Mannia based upon the insurer's payment to [LBM] for damages resulting from the fire that occurred on July 3, 2010, which is the subject of this lawsuit.

Appellant's App. p. 236-37. In addition, LBM deposed Mannia, and elicited the following testimony:

Q: Okay. Based on your discussions with the lady that was there on behalf of the management company, did you have any understanding at all concerning whether if [sic] you wanted to have insurance for your stuff in the apartment, whether you had to take out your own renter's insurance?

A: Yes.

Q: Was that something that she explained to you?

A: Yes.

Q: Okay. Based on your discussions with this lady representing the management company, did you have any understanding at all as to whether or not either you or your mother would be an insured under the apartment building's insurance policy?

A: I don't understand the question.

Q: Okay. Do you remember anything being discussed with the property management lady as to whether the apartment complex's own insurance would cover any of your property?

A: I don't remember.

Q: Okay. Is it fair to say that you had no understanding one way or the other whether you would be insured or qualify as an uninsured person under the apartment complex's property insurance?

A: I don't understand the question.

6

Q: Okay. Did you have any understanding as to whether or not the apartment complex would have any type of property insurance for their building?

A: I don't know.

Q: That's not something you recall discussing?

A: I don't understand the question.

Q: Okay.

A: Sorry.

Q: Are you familiar with the concept of property insurance?

A: Yes.

Q: Okay. You understand that, for example, your mother and father, I'm assuming, have property insurance on their home. Correct?

A: Correct.

Q: Okay, by the way, do you own a home now?

A: No.

Q: Okay. Did you have any understanding when you signed this lease that the apartment complex would have property insurance to cover its building in case there was a loss?

A: Yes.

Q: Okay. And what was that understanding based on?

A: I don't understand. What . . . .

Q: How did you learn that the apartment complex would have property insurance on its building when you signed this lease?

A: I was told.

Q: And who told you that?

A: The woman.

7

Q: Okay. So there was some – the lady told you that the apartment complex would have property insurance for its building?

A: Right.

Q: What else, if anything, did she explain to you about the building's property insurance?

A: I don't remember.

Q: Okay. As a result of your conversation with this lady about the building's -- about the apartment complex's property insurance, did you have any understanding at all one way or the other as to whether you would be insured -- you, [ ] Mannia -- under the apartment complex's property insurance?

A: I don't understand the question.

Q: Sure. You mentioned that you remember something being said by this property management representative about the fact that the apartment complex would have property insurance for the building. Right?

A: Right.

Q: Okay. Based on your conversation with her about that issue, did you leave the meeting with the understanding that you personally would be covered as an insured under the apartment complex's insurance policy?

A: No.

Q: Okay. Was it your understanding that you personally would not be covered as an insured under the apartment complex's insurance policy?

A: I'm sorry. I don't understand.

Q: Sure. Two questions ago, you indicated that you left the meeting --

A: Right.

Q: -- and it was not your understanding that you personally would be covered as an insured under the apartment complex's insurance policy. Correct?

A: Correct.

Q: Okay. You were going to say something?

A: I was told to get insurance.

Q: Okay. So based on your discussion, you came away with the understanding that (a) the building would take out an insurance policy for the building, and (b) that you had to take out an insurance policy for your belongings?

A: Yes.

Q: Okay. But you had no expectation that you personally would be covered in any way under the apartment complex's insurance policy. Is that correct?

A: Right.

Q: Did you, in fact, ever go out and obtain renter's insurance?

A: Yes.[3]

*Id.* at 237-40 (internal objections omitted).

In October 2013 Mannia filed a motion for summary judgment, again urging the trial court in her supporting memorandum to adopt the no-subrogation *Sutton* rule. *Id.* at 78. The trial court granted the motion, finding that LBM's claims were barred under both the *Sutton* rule and the case-by-case approach, and stating as follows at the hearing on the motion:

> I think I want to let the Court of Appeals have another opportunity to rule on this, so I'm going to grant the motion for summary judgment. . . . And then we'll receive instructions from the Court of Appeals, and we'll do whatever they tell us to do, case-by-case, whatever it is. And we'll have a jury trial, if that is the case, and go from there.

Tr. p. 28. LBM now appeals.

---

[3] According to the transcript of the summary-judgment hearing, Mannia did not actually obtain renter's insurance, but was instead covered by her parents' homeowners' policy. Tr. p. 12.

**Discussion and Decision**

On appeal, LBM argues that this Court should "reject the legal fiction created by the *Sutton* rule that a residential tenant is an additional insured under her landlord's property insurance policy through her payment of rent." Appellant's Br. p. 6. Instead, LBM continues, we should adhere to, clarify, and formally adopt as Indiana law the "middle ground" or case-by-case approach. *Id.* at 6, 12. Furthermore, LBM asserts that because the lease in this case clearly permits subrogation, this Court should reverse the trial court's grant of summary judgment in favor of Mannia. We consider each of these issues in turn.[4]

**I. Subrogation in Indiana**

Subrogation is a doctrine of equity long recognized in Indiana. *Erie Ins. Co. v. George*, 681 N.E.2d 183, 186 (Ind. 1997). It applies whenever a party, not acting as a volunteer, pays the debt of another that, in good conscience, should have been paid by the one primarily liable. *Id.* The ultimate purpose of the doctrine, as with other equitable principles, is to prevent unjust enrichment.[5] *Id.* (citing 73 Am. Jur. 2d *Subrogation* § 4 (1974)). Because subrogation is an equitable remedy, in determining whether an insurer

---

[4] Because nobody is arguing that Indiana should adopt an "anti-*Sutton*" per se rule favoring subrogation, and because we see no basis for doing so, we need not consider this possibility.

[5] In Couch, subrogation is considered from the perspective of the insured, the insurer, and the tortfeasor. 16 COUCH ON INSURANCE § 222:8 (3d ed. 2000). With regard to the tortfeasor's perspective, Couch writes that a wrongdoer who is legally responsible for the harm should not receive the windfall of being absolved from liability because the insured procured, and paid for, insurance. *Id.* But in a law-review note, one legal scholar writes that "[because] insurers do not consider the likelihood of a successful subrogation collection in determining premiums[,] . . . any recovery through subrogation for an insured risk is undoubtedly a windfall to the insurer." Aleatra P. Williams, *Insurers' Rights of Subrogation Against Tenants: The Begotten Union Between Equity and Her Beloved*, 55 DRAKE L. REV. 541, 593 (2007).

may bring a subrogation action in a particular case, courts must weigh "the principles of equity and good conscience." *RAM Mut. Ins. Co. v. Rohde*, 820 N.W.2d 1, 16 (Minn. 2012) (citing *Dix Mut. Ins. Co. v. LaFramboise*, 597 N.E.2d 622, 626 (Ill. 1992) (explaining that the equities of the case should be considered in addition to examining "the provisions of the lease as a whole [and] the reasonable expectations of the parties"); *Am. Family Mut. Ins. Co.*, 757 N.W.2d at 595 (allowing landlord's insurer to maintain a subrogation action against tenant's liability insurer after examining the lease and "[c]onsidering the equitable underpinnings of subrogation"). When the insurer claims a right through subrogation, it stands in the shoes of the insured and takes no rights other than those which the insured had. *United Farm Bureau Mut. Ins. Co. v. Owen*, 660 N.E.2d 616, 619 (Ind. Ct. App. 1996).

Although there is a vast body of law from across the country involving landlords' insurers pursuing negligent residential tenants through subrogation,[6] in Indiana the caselaw is extremely limited. *See id.*; *Mannia*, 981 N.E.2d 569. In *Owen*, five tenants who occupied a house the night before the electricity was restored started a fire that caused substantial damage when they used a kerosene lantern during the night. *See Owen*, 660 N.E.2d at 617. Included in the parties' lease agreement was an "Indemnification and Release" provision, which read in relevant part as follows:

> Landlord and Tenant do each hereby release the other from all liability for any accident, damage or injury caused to person or property, provided, this release shall be effective only to the extent that the injured or damaged party

---

[6] One court described the question of whether, for subrogation purposes, and absent an express provision in the parties' lease to the contrary, the law presumes that a tenant is coinsured under his or her landlord's insurance policy such that the landlord's insurer can maintain a subrogation action against a tenant as "a dispute that has raged in subrogation jurisprudence for the last 30 years." *Tri-Par Invs., L.L.C. v. Sousa*, 680 N.W.2d 190, 194 (Neb. 2004).

11

is insured against such injury or damage and only if this release shall not adversely affect the right of the injured or damaged party to recover under such insurance policy.

*Id.* The landlord had insured the premises with Farm Bureau and subsequently collected $98,247.46 on its policy. *Id.* The tenant who had started the fire with Owen settled with the insurer for $43,000, and the insurer then pursued its claim against Owen for the remaining $55,247.14, plus costs. *Id.* At the time of collecting from the insurer, the landlord had signed a subrogation agreement stating that she had not "released or discharged any [] claim or demand" against the tenants. *Id.* at 619. Nonetheless, this Court held that because the landlord had—in the lease provision cited above—released Owen of liability to the extent the landlord was covered by insurance, and the insurer had paid in full, the insurer was barred from pursuing Owen since the insurer "stepped into [the landlord's shoes] and took no rights other than those which [the landlord] had at the time." *Id.*

In *LBM Realty, LLC v. Mannia*, another panel of this Court reversed a motion to dismiss and remanded in the same matter that is before us now, stating that because "Indiana law does not currently preclude a landlord's insurer from bringing a subrogation claim against a tenant" and because the allegations in LBM's complaint established a set of circumstances under which it would be entitled to relief, the complaint stated claims upon which relief could be granted. *Mannia*, 981 N.E.2d at 578. In that instance, the Court disapproved of the trial court's adoption of a no-subrogation approach as "putting the proverbial cart before the horse by first adopting a rule precluding subrogation claims

12

against tenants and then reviewing LBM's complaint in light of that newly adopted rule."

*Id.* The Court also wrote as follows:

> When filing her motion to dismiss, Mannia did not argue that LBM's claims for negligence or breach of contract were somehow lacking in sufficiency or that the allegations in the complaint did not establish any set of circumstances under which LBM—as landlord—would be entitled to relief. Instead, her motion to dismiss for failure to state a claim was premised on the argument that LBM's complaint—as a subrogation action—*would* fail to state a claim upon which relief could be granted *if the* trial court first adopted the no-subrogation approach. Indeed, by asking the trial court to adopt no-subrogation approach, Mannia recognized that the law in Indiana did not preclude subrogation by a landlord's insurer against a tenant.

*Id.* at 577. Although the Court acknowledged in footnotes the *Sutton* case and other jurisdictions' responses to the subrogation issue, the Court ultimately decided to "leave for another day" the question of which approach Indiana should adopt. *Id.* at 578.

## II. The *Sutton* Rule

Mannia urges us to adopt the position articulated by the Oklahoma Court of Appeals in *Sutton v. Jondahl*, 532 P.2d 478, now known as the *Sutton* doctrine. In that case, a tenant and his ten-year-old son, who had caused a fire while playing with a chemistry set given to him for Christmas, were sued by the property owner/landlord's insurer on negligence grounds. *Id.* at 479. After a full trial, the insurer prevailed against the father but not the son. *Id.* at 481. The appellate court reversed the verdict against the father, finding prejudicial error in the jury instructions, but then went on to announce that the insurer could not pursue its subrogation claim because "the law considers the tenant as a co-insured of the landlord absent an express agreement between them to the contrary, comparable to the

13

permissive-user feature of automobile insurance."[7]  *Id.* at 482.  The *Sutton* court went on

to say:

> This principle is derived from a recognition of a relational reality, namely, that both landlord and tenant have an insurable interest in the rented premises—the former owns the fee and the latter has a possessory interest. Here the landlords (Suttons) purchased the fire insurance from Central Mutual Insurance Company to protect such interests in the property against loss from fire. This is not uncommon. And as a matter of sound business practice the premium paid had to be considered in establishing the rent rate on the rental unit. Such premium was chargeable against the rent as an overhead or operating expense. **And of course it follows then that the tenant actually paid the premium as part of the monthly rental**.

> The landlords of course could have held out for an agreement that the tenant would furnish fire insurance on the premises. But they did not. They elected to themselves purchase the coverage. To suggest the fire insurance does not extend to the insurable interest of an occupying tenant is to ignore the realities of urban apartment and single-family dwelling renting. **Prospective tenants ordinarily rely upon the owner of the dwelling to provide fire protection for the realty (as distinguished from personal property) absent an express agreement otherwise.** Certainly it would not likely occur to a reasonably prudent tenant that the premises were without fire insurance protection or if there was such protection it did not inure to his benefit and that he would need to take out another fire policy to protect himself from any loss during his occupancy. Perhaps this comes about because the companies themselves have accepted coverage of a tenant as a natural thing. Otherwise their insurance salesmen would have long ago made such need a matter of common knowledge by promoting the sale to tenants of a second fire insurance policy to cover the real estate.

> **Basic equity and fundamental justice upon which the equitable doctrine of subrogation is established requires that when fire insurance is provided for a dwelling it protects the insurable interests of all joint owners including the possessory interests of a tenant absent an express agreement by the latter to the contrary. The company affording such coverage should not be allowed to shift a fire loss to an occupying tenant even if the latter negligently caused it.** . . . For to conclude otherwise is to shift the insurable risk assumed by the insurance company from it to the

---

[7] In rejecting this analogy, the Maryland Supreme Court wrote, "Permissive users are regarded as insureds under . . . a[n automobile insurance] policy because the policy expressly provides coverage for them, usually by including them in the definition of 'insured.'" *Rausch v. Allstate Ins. Co*., 882 A.2d 801, 815 (Md. 2005).

tenant—a party occupying a substantially different position from that of a fire-causing third party not in privity with the insured landlord.

*Id.* (emphasis added; internal citation omitted).  In sum, *Sutton* stands for the proposition that absent an express agreement in the lease to the contrary, landlord and tenant are considered co-insureds under a landlord's fire-insurance policy; the insurer, therefore, has no right of subrogation against the tenant to recover payments made under the insurance policy due to fire loss, even if the fire is caused by the tenant's negligence.  *See id.*; *see also Dattel Family Ltd. P'ship v. Wintz*, 250 S.W.3d 883 (Tenn. Ct. App. 2007).

The "co-insured" aspect of the *Sutton* approach has been widely criticized.  In a leading insurance-law treatise, for instance, Appleman writes as follows:

> *Sutton*, the leading modern case denying subrogation of lessees, cites no cases for the proposition that the lessee is a co-insured of the lessor, comparable to a permissive user under an auto insurance policy.  Contrary to the [*Sutton*] court's statement, the fact both parties had insurable interests does not make them co-insureds.  The insurer has a right to choose whom it will insure and did not choose to insure the lessees, and under this holding the lessee could have sued the insurer for loss due to damage to the realty, e.g., loss of use if policy provides such coverage.  Cases following *Sutton*, however, have at least impliedly restricted the co-insurance relationship to one limited solely to the purpose of prohibiting subrogation.

6A J. A. Appleman & J. Appleman, Insurance Law and Practice § 4055, pp. 138-39 n.86.10 (Cum. Supp. 2014).

Courts rejecting *Sutton* have tended to agree with Appleman in rejecting the co-insurer rationale.  In Iowa, for instance, the Supreme Court wrote: "[T]he theory that fire insurance on an entire dwelling includes the interest of both landlord and tenant as a matter of law . . . disregards the fact that these are separate estates capable of being separately valued and separately insured."  *Neubauer v. Hostetter*, 485 N.W.2d 87, 90 (Iowa 1992).

15

And in *56 Assoc. ex rel. Paolino v. Frieband*, 89 F. Supp. 2d 189, 193 (D.R.I. 2000), the Rhode Island court rejecting *Sutton* wrote, "[A]n insurance policy is a contract between an insurer and its insured. . . . Thus, a court is not free to rewrite a policy or read provisions into it in order to achieve what the court subjectively may believe to be a desirable result."

Although various jurisdictions have adopted the *Sutton* rule,[8] not all have adopted the same rationale for that approach, and some have offered their own "law and economics" justifications for the rule. *See Rausch v. Allstate Ins. Co.*, 882 A.2d 801, 812 (Md. 2005). In Connecticut, for instance, the Supreme Court held that in the absence of an express agreement between the parties covering the question, there is no right of subrogation on the part of a landlord's fire insurer against a tenant of the landlord's premises. *See DiLullo v. Joseph*, 792 A.2d 819 (Conn. 2002). The court recognized that under traditional rules of insurance law and contract law, "a tenant is not considered a coinsured on his landlord's fire policy simply because he has an insurable interest in the premises and pays rent," and "whether subrogation would apply would ordinarily depend, in large part, on a case-by-case analysis of the language of the insurance policies and leases involved." *Id.* Nonetheless, the court found that on the grounds of "policy and fairness," and in the public-policy interest of "disfavoring economic waste," the *Sutton* rule was appropriate:

---

[8] *See*, *e.g.*, *Alaska Ins. Co. v. RCA Alaska Commc'ns, Inc.,* 623 P.2d 1216, 1218 (Alaska 1981); *DiLullo v. Joseph*, 792 A.2d 819, 822 (Conn. 2002); *Lexington Ins. Co. v. Raboin*, 712 A.2d 1011, 1016 (Del. Super. Ct.), *aff'd*, 723 A.2d 397 (Del. 1998); *Cont'l Ins. Co. v. Kennerson*, 661 So.2d 325, 330-31 (Fla. Dist. Ct. App. 1995); *N. River Ins. Co. v. Snyder*, 804 A.2d 399, 403-04 (Me. 2002); *Peterson v. Silva*, 704 N.E.2d 1163, 1164-65 (Mass. 1999); *N.H. Ins. Grp. v. Labombard*, 399 N.W.2d 527, 531 (Mich. Ct. App. 1986); *Buckeye State Mut. Ins. Co. v. Humlicek*, 822 N.W.2d 351, 359-60 (Neb. 2012); *Sousa*, 680 N.W.2d at 198-99; *Safeco Ins. Co. v. Capri*, 705 P.2d 659, 660-61 (Nev. 1985); *Cambridge Mut. Fire Ins. Co. v. Crete*, 846 A.2d 521, 523 (N.H. 2004); *Cmty. Credit Union of New Rockford, N.D. v. Homelvig*, 487 N.W.2d 602, 605 (N.D. 1992); *Sutton*, 532 P.2d at 482; *Wintz*, 250 S.W.3d at 892; *GNS P'ship v. Fullmer*, 873 P.2d 1157, 1163-64 (Utah Ct. App. 1994); *Cmty. Ass'n Underwriters of Am., Inc. v. Kalles,* 259 P.3d 1154, 1158 (Wash. Ct. App. 2011).

16

[I]t would be inappropriate to create a default rule that allocates to the tenant the responsibility of maintaining sufficient insurance to cover a claim for subrogation by his landlord's insurer. Such a rule would create a strong incentive for every tenant to carry liability insurance in an amount necessary to compensate for the value, or perhaps even the replacement cost, of the entire building, irrespective of the portion of the building occupied by the tenant. That is precisely the same value or replacement cost insured by the landlord under his fire insurance policy. Thus, although the two forms of insurance would be different, the economic interest insured would be the same. This duplication of insurance would, in our view, constitute economic waste and, in a multiunit building, the waste would be compounded by the number of tenants. We think that our law would be better served by having the default rule of law embody this policy against economic waste, and by leaving it to the specific agreement of the parties if they wish a different rule to apply to their, or their insurers', relationship.[9]

*Id.* at 822-23 ((citing *Peterson v. Silva*, 704 N.E.2d 1163, 1166 (Mass. 1999) ("It surely is not in the public interest to require all the tenants to insure the building which they share, thus causing the building to be fully insured by each tenancy.")).

### III. The Case-By-Case Approach[10]

---

[9] The *DiLullo* court also wrote: "[W]e agree with Judge Keeton and Professor Widiss that, in most instances, neither landlords nor tenants ordinarily expect that the landlord's insurer would be proceeding against the tenant, unless expert counseling to that effect had forewarned them." *DiLullo*, 792 A.2d at 823 (citing R. Keeton & A. Widiss, Insurance Law § 4.4(b), p. 340-41 (1988)).

[10] As with the pro-subrogation approach, it is difficult to accurately determine the number of jurisdictions that have adopted the case-by-case approach because, depending on the language of the lease involved, both no-subrogation and pro-subrogation courts have often tied their analysis to the terms of the lease, rendering their analysis very similar to that undertaken by case-by-case courts. *See Rausch*, 882 A.2d at 814 (explaining that most of the courts that have dealt with the issue presented in this case, including some that have been characterized as either no- or pro-subrogation courts "have taken a middle approach" and "looked to the lease as a whole to determine" the parties' expectations). *RAM*, 820 N.W.2d at 12.

Notwithstanding the difficulty of drawing clear lines, the following cases appear to adopt a case-by-case approach: *Gen. Mills, Inc. v. Goldman*, 184 F.2d 359, 366 (8th Cir. 1950); *Gen. Accident Fire & Life Assurance Corp. v. Traders Furniture Co.*, 401 P.2d 157, 159-60 (Ariz. Ct. App. 1965); *Fire Ins. Exch. v. Hammond*, 99 Cal.Rptr.2d 596, 601 (Cal. Ct. App. 2000); *U.S. Fid. & Guar. Co. v. Let's Frame It, Inc.*, 759 P.2d 819, 823 (Colo. Ct. App. 1988); *Underwriters of Lloyds of London v. Cape Publ'ns, Inc.*, 63 So. 3d 892, 896 (Fla. Dist. Ct. App. 2011); *Bannock Bldg. Co. v. Sahlberg*, 887 P.2d 1052, 1056 (Idaho 1994); *LaFramboise*, 597 N.E.2d at 625; *Seaco Ins. Co. v. Barbosa*, 761 N.E.2d 946, 951 (Mass. 2002) (rejecting *Sutton* with respect to commercial leases); *Rausch*, 882 A.2d 801, 814-15; *RAM*, 820 N.W.2d 1 at 12;

LBM urges us to explicitly reject the *Sutton* doctrine and, instead, to formally adopt as Indiana law the case-by-case approach. "The case-by-case approach eschews presumptions that a tenant is or is not a co-insured of the landlord." *Underwriters of Lloyds of London v. Cape Publ'ns, Inc.*, 63 So. 3d 892, 895 (Fla. Dist. Ct. App. 2011). "Instead, the court examines the lease as a whole to determine the parties' reasonable expectations as to who should bear the risk of loss when a tenant negligently damages the leased premises." *Id.* (citing *Am. Family Mut. Ins. Co. v. Auto-Owners Ins. Co.*, 757 N.W.2d 584 (S.D. 2008); *Rausch*, 882 A.2d 801; *Union Mut. Fire Ins. Co. v. Joerg*, 824 A.2d 586 (Vt. 2003)). In addition to the actual language of a lease or insurance policy, courts engaged in a case-by-case analysis may also examine "any other admissible evidence" shedding light on the expectations of the parties. *RAM*, 820 N.W.2d at 15-16 (citing *Rausch*, 882 A.2d at 814.) Such evidence could include, among other things, the types of insurance purchased by each party as evidence of each party's expectations with respect to its responsibility for particular losses. *Id.* (citing *Am. Family Mut. Ins. Co.*, 757 N.W.2d at 594).

Finally, because subrogation is an equitable remedy, in determining whether an insurer may bring a subrogation action in a particular case, courts taking this approach must weigh "the principles of equity and good conscience." *Id.* (citing *LaFramboise*, 597 N.E.2d at 626 (explaining that the equities of the case should be considered in addition to examining "the provisions of the lease as a whole [and] the reasonable expectations of the parties"); *Am. Family Mut. Ins. Co.*, 757 N.W.2d at 595 (allowing an insurer to maintain a

---

*Cincinnati Ins. Co. v. Getter*, 958 N.E.2d 202 (Ohio Ct. App. 2011); *Koch v. Spann*, 92 P.3d 146, 152 (Or. Ct. App. 2004); *Am. Family Mut. Ins. Co. v. Auto-Owners Ins. Co.*, 757 N.W.2d 584, 594 (S.D. 2008); *Monterey Corp. v. Hart*, 224 S.E.2d 142, 144 (Va. 1976); *Union Mut. Fire Ins. Co. v. Joerg*, 824 A.2d 586, 590 (Vt. 2003).

subrogation action after examining the lease and "[c]onsidering the equitable underpinnings of subrogation"). In balancing the equities, the court may consider, among other factors, whether the lease is a contract of adhesion, and if the provisions allocating responsibility "are found to be unfair," may declare such provisions "invalid as being in violation of public policy." *Rausch*, 882 A.2d at 815. Moreover, the fact that the leased premises are part of a large multi-unit structure may be relevant to the equities and the parties' reasonable expectations regarding responsibility. *RAM*, 820 N.W.2d at 16. This factor may be relevant because, in the absence of a "very clear contractual obligation to the contrary," the tenant likely is not "thinking beyond the leased premises" and may not "as a practical matter . . . be able to afford, or possibly even obtain, sufficient liability insurance to protect against such an extended loss." *Id*. (citing *Rausch*, 882 A.2d at 816).

In *Rausch*, 882 A.2d 801, the Maryland Court of Appeals consolidated two cases for appellate purposes in order to address the issue before us today. In one of the cases, a tenant living in a multi-unit apartment development left candles burning in her bedroom when she went to answer the telephone; after smelling smoke, she discovered that her bedspread had caught fire. *Id.* at 805. The fire caused extensive damage to the second floor of the apartment building, and the landlord's insurer—after paying over $83,000 to repair the damages—pursued the tenant to recover its costs. *Id.* at 805-06. Included in the tenant's written lease were three provisions that the court found relevant:

- [In a provision discussing a storage space made available to the tenant]: "Resident expressly agrees that landlord shall not be liable for any loss, damage or injury to property. Tenant shall have insurance coverage for this storage area *as well as Renter's Insurance for the apartment.* Landlord is not responsible for such loss which may be incurred.";

19

- Another provision required the tenant to reimburse the landlord for "any loss, damage or actual cost of repairs or service caused in the apartment or apartment complex by improper use or negligence of tenant or tenant's guests or occupants"; and

- Finally, the tenant, when moving out, was required to "surrender the apartment in the same condition as when received, reasonable wear expected. Reasonable wear means occurring without negligence, carelessness, accident, or abuse."

*Id.* at 805. Other than the reference in (1) to renter's insurance, which the tenant had obtained, the lease was silent with respect to insurance. *Id.* However, the owner had obtained a fire-insurance policy that was in effect at the time of the fire. *Id.* The policy contained a subrogation clause, stating that, "[i]f any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment" and that the payee "must do everything necessary to secure our rights and must do nothing after loss to impair them." *Id.* The subrogation clause permitted the insured to waive its rights against another party, but the insured had not done so. *Id.*

After considering at length the "legal landscape" on this issue, the *Rausch* court ultimately determined that

> [t]he middle approach, followed by the great majority of courts that have dealt with the issue, provides an adequate and supportable analytical framework. Although that framework makes the analysis largely a case-by-case one, certain general principles emanating from basic contract law will control[.]

*Id.* at 815. Included among these principles are the following: provisions included in a lease that create or enhance a tenant's liability are subject to the normal rules of contract law, and there can be no subrogation unless there is liability in the first instance by the

20

tenant to the landlord. *Id.* at 816. Moreover, if, in the lease or by some other commitment, the landlord has communicated to the tenant an express or implied agreement to maintain fire insurance on the leased premises, absent some compelling provision to the contrary, the court may properly conclude that—notwithstanding a general "surrender in good condition" or "liability for negligence" clause in the lease—the reasonable expectation was that the landlord would look only to the policy for compensation for fire loss covered by the policy. *Id.* And finally, the court wrote:

> If the leased premises is a unit within a multi-unit structure, absent a clear, enforceable provision to the contrary, a court may properly conclude that the parties anticipated and reasonably expected that the landlord would have in place adequate fire insurance covering the entire building and, with respect to damage caused by the tenant's negligence to parts of the building beyond the leased premises, would look only to the policy, to the extent of its coverage, for compensation. That expectation has a rational and practical basis. Whatever general common law liability a tenant may have for damage to another person's property caused by the tenant's negligence, it is not likely, unless faced with a very clear contractual obligation to the contrary, that the tenant is thinking beyond the leased premises or, as a practical matter, would be able to afford, or possibly even obtain, sufficient liability insurance to protect against such an extended loss. Nor should the law encourage the economic waste that would result from multiple layers of insurance by the individual tenants to cover the same loss.[11]

*Id.*

---

[11] As observed by the Nebraska Supreme Court, "The court thus seemed to adopt a[n anti-subrogation] per se rule *only for those units not leased by the tenant.* We find that to be equally true whether there is one other unit or many other units. The tenant is not thinking beyond the leased premises unless the lease agreement alerts the tenant otherwise. The right to subrogation does not depend on the number of walls separating the units or whether there are common areas. The pertinent fact is that there is one building in which the fire from one unit within that building can easily spread to another. It is reasonable for the tenant to presume that the landlord has fire protection for that building. And it is reasonable for a tenant to expect that if he negligently starts a fire, the insurance company will not sue him to recoup payments made under a policy which was purchased by the landlord precisely for such an occurrence."

*Buckeye State Mut. Ins. Co.*, 822 N.W.2d at 359 (emphasis in original).

Having articulated the foregoing principles, the Maryland court affirmed summary judgment for the tenant to the extent that the claim under the landlord's insurance policy included payments for damage to parts of the building beyond the tenant's leased premises, but the court held that summary judgment was inappropriate with respect to liability for amounts paid by the insurer to repair damage done to the leased premises. *Id.* at 817. Because the tenant's renter's insurance policy was not part of the record, the appellate court found that it could not determine as a matter of law what the parties' reasonable expectations were with respect to the damage to the leased premises. *Id.* The *Rausch* court wrote:

> Having concluded that there was sufficient evidence of negligence on [the tenant]'s part to create a triable issue, the court will have to examine the lease and such other admissible evidence in order to determine whether there is a triable issue as to the reasonable expectation of the parties, and, if necessary, deal further with the issue of [the tenant]'s negligence.

*Id.* at 817.

And in *RAM*, the Minnesota Supreme Court rejected the previously adopted *Sutton* doctrine in favor of "an approach that is largely a case-by-case one," 820 N.W.2d at 14, concluding that this was the "soundest method to evaluate when an insurer has a subrogation claim against an insured's tenant." 820 N.W.2d at 12. The *RAM* court further explained its reasoning as follows:

> By examining the reasonable expectations of the contracting parties to determine whether subrogation is appropriate in a particular case, the case-by-case approach avoids the legal assumptions of the other approaches, and thus best effectuates the intent of the parties by eliminating presumptions altogether. While the case-by-case approach does not provide the same kind of predictability that accompanies either the pro- or no-subrogation approaches, the case-by-case method provides more predictability to parties by simply enforcing the terms of their contracts.

*Id.*

Having considered the range of possible approaches, we conclude that Indiana should hereby adopt the largely case-by-case approach, finding that a tenant's liability to the landlord's insurer for damage-causing negligence depends on the reasonable expectations of the parties to the lease as ascertained from the lease as a whole and any other admissible evidence. *See id.* at 14; *Rausch*, 882 A.2d at 815. Although the case-by-case approach is said to provide less predictability than either the pro- or no-subrogation approaches, we find that this approach best effectuates the intent of the parties by simply enforcing the terms of their lease. *See RAM*, 820 N.W.2d at 12. In determining the expectations of the parties as articulated in the lease, courts should look for evidence indicating which party agreed to bear the risk of loss for a particular type of damage. *See id.* at 15. For instance, if the lease indicates that the landlord has agreed to procure insurance covering a particular loss, a court "may properly conclude that, notwithstanding a general 'surrender in good condition' or 'liability for negligence' clause in the lease," the landlord and tenant reasonably expected "that the landlord would look only to the policy, and not to the tenant, for compensation for . . . loss[es] covered by the policy." *Id.* (citing *Rausch*, 882 A.2d at 816). Likewise, if a lease obligates a tenant to procure insurance covering a particular type of loss, such a provision will provide evidence that the parties reasonably anticipated that the tenant would be liable for that particular loss, which would allow another insurer who pays the loss to bring a subrogation action against the tenant. *Id*. (citing *Am. Family Mut. Ins. Co*., 757 N.W.2d at 593).

However, with regard to tenants in a multiunit dwelling, we find that absent clear notice—ideally in the form of an unambiguous, enforceable lease provision—that a negligent tenant will be held liable for damages to areas of the building *beyond the tenant's leased premises*, such liability would not be within the tenant's reasonable expectations and is therefore barred. *See Rausch*, 882 A.2d at 816 ("Whatever general common law liability a tenant may have for damage to another person's property caused by the tenant's negligence, it is not likely, unless faced with a very clear contractual obligation to the contrary, that the tenant is thinking beyond the leased premises or, as a practical matter, would be able to afford, or possibly even obtain, sufficient liability insurance to protect against such an extended loss."). This approach also avoids the unreasonable expectation and economic waste of requiring every tenant in a multiunit apartment building policy to carry insurance coverage adequate to cover damage to the entire building, particularly when the landlord presumably already maintains such coverage. *Id.* ("Nor should the law encourage the economic waste that would result from multiple layers of insurance by the individual tenants to cover the same loss.").

### IV. Summary-Judgment Review

On appeal, we review the grant of summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (quoting Ind. Trial Rule 56(C)). A fact is "material" if its resolution would affect

the outcome of the case, and an issue is "genuine" if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences. *Id.* (internal citations omitted). In determining whether there is a genuine issue of material fact precluding summary judgment, all doubts must be resolved against the moving party and the facts set forth by the party opposing the motion must be accepted as true. *Hyperbaric Oxygen Therapy Sys., Inc. v. St. Joseph Med. Ctr. of Ft. Wayne, Inc.*, 683 N.E.2d 243, 247 (Ind. Ct. App. 1997), *trans. denied*.

In the case before us, the parties' lease includes a provision titled "Insurance," which is silent as to the issue of LBM's obligation to maintain property insurance, but does state in bold type: "Owner recommends the Resident obtain renter's insurance." Appellant's App. p. 7. In a deposition, Mannia testified that in "discussions with [a] lady representing the management company," she was told that the apartment complex would have property insurance on the building, but Mannia also testified that she did not believe she would be covered under the apartment complex's insurance policy. *Id.* at 238-40. Mannia also testified during this deposition that she was told to obtain—and did in fact obtain—renter's insurance. *Id.* at 239-40. According to the transcript from the summary-judgment hearing, however, she did not obtain renter's insurance but was instead covered by her parents' homeowners' policy. Tr. p. 12. Thus, it is unclear what insurance—if any—Mannia was carrying at the time of the fire, and there are no insurance policies included in the record before this Court today.

The lease also contains a provision holding Mannia liable for "any injury or damage done to the Leased Premises, common areas or any other property of Owner . . . ."

Appellant's App. p. 10. But there is no clear and enforceable lease provision putting Mannia on notice that she would be held liable for damage caused by negligence to areas of the multiunit apartment building beyond the leased premises (and should obtain liability insurance to provide for that possibility); we find, therefore, no evidence that the parties anticipated and reasonably expected that Mannia would be so liable. *See Rausch*, 882 A.2d at 816. Hence, to the extent that the $743,402.86 insurance claim is for damage to areas beyond the leased premises, we find that summary judgment was properly granted.

However, summary judgment was inappropriate with respect to damage to the leased premises. On remand, we instruct the trial court to engage in the analysis of the case-by-case approach.[12] This means, first, that the court should consider the lease and any other relevant and admissible evidence, including—among other things—the insurance maintained by each party as evidence of each party's expectations with respect to liability for damage to the leased premises. *See Am. Family Mut. Ins. Co.*, 757 N.W.2d at 594. Second, because subrogation is an equitable remedy, the trial court must also weigh "the principles of equity and good conscience" as applied to this particular case. *See*

---

[12] Although the trial court found in its order that LBM's subrogation claims would be barred under even a case-by-case approach, it appears from the trial court's discussion of this approach that the weighing of relevant factors was too limited. *See* Appellant's App. p. 246. To be specific, the trial court relied primarily on the recommendation within the lease that Mannia obtain renter's insurance, writing as follows:

> By recommending that the resident only obtain renter's insurance and not a fire policy on the entire structure, a tenant is reasonably able to infer that they are only responsible for the contents of their apartment and personal liability protection for someone injured and associated with their limited leased space.

*Id.* But the trial court does not appear to give any weight to, for instance, the lease provision stating that "Resident is and shall be liable for any injury or damage done to the Leased Premises, common areas or any other property of Owner caused by [R]esident, any occupant, or any other person whom Resident permits to be in or about the Leased Premises." *Id.* at 10.

*LaFramboise*, 597 N.E.2d at 626. In sum, the trial court should analyze all relevant and admissible evidence in order to determine the parties' expectations and should weigh and balance the equities of the case—as well as addressing the issue of Mannia's negligence—in order to determine Mannia's liability for the damage to the leased premises.

We affirm in part, reverse in part, and remand with instructions.

FRIEDLANDER, J. and MAY, J., concur.