# IN THE SUPREME COURT, STATE OF WYOMING

## 2023 WY 15

**OCTOBER TERM, A.D. 2022**

**February 8, 2023**

PRIMROSE RETIREMENT COMMUNITIES, LLC
and GILLETTE RETIREMENT, LLC,

Appellants
(Plaintiffs),

v.

GHIDORZI CONSTRUCTION COMPANY, LLC,

Appellee
(Defendant/Third-party Plaintiff).

S-22-0162

*Appeal from the District Court of Campbell County*
*The Honorable Bill Simpson, Judge*

***Representing Appellants:***

Amanda K. Roberts and J. Kyle Hendrickson, Lonabaugh and Riggs, LLP,
Sheridan, Wyoming; Ryan W. McGrath and J. David Horning, Horning, Horning &
McGrath, LLC, Gillette, Wyoming. Argument by Mr. Hendrickson.

***Representing Appellee:***

Stephenson D. Emery, Williams, Porter, Day & Neville, P.C., Casper, Wyoming;
Nicholas D. Harken and Eugene M. LaFlamme, McCoy Leavitt Laskey, LLC,
Waukesha, Wisconsin. Argument by Mr. Harken.

***Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.***

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]     In this construction contract dispute, Primrose Retirement Communities, LLC and its local affiliate Gillette Retirement, LLC (together Primrose)[1] appeal from the district court's grant of summary judgment in favor of Ghidorzi Construction Company, LLC (Ghidorzi) on claims of breach of contract and breach of the implied covenant of good faith and fair dealing.  The district court determined that Primrose failed to submit evidence that Ghidorzi's alleged breach caused Primrose's damages and that the contract language obviated any need to impose an implied covenant.  We reverse in part and affirm in part.

## ISSUES

[¶2]     The issues are:

> 1.     Did the district court err in granting summary judgment on Primrose's breach of contract claim?
>
> 2.     Did the district court err in granting summary judgment on Primrose's breach of the implied covenant of good faith and fair dealing?

## FACTS

[¶3]     In 2008, Primrose found a location for a new assisted living facility in Gillette, Wyoming.  Primrose retained WAI Continuum as the project architect and Terracon Consultants, a geotechnical consulting firm, to assess the soils, prepare a soils report, and make structural recommendations for construction and to inform potential bidders.  On August 5, 2008, Terracon issued its report—the Terracon Report—which identified expansive soils under the construction site and provided recommendations "to help mitigate the effects of soils shrinkage and expansion" on the proposed facility.  Terracon's first recommendation was that "the proposed structure be supported on a drilled pier/caisson foundation system bearing on sandstone bedrock."  The report contained an alternate recommendation that, "[i]f the owner is willing to assume additional risk associated with soil shrinkage and expansion, spread footings bearing on a minimum of 5 feet of new, non-expansive, low-permeability, engineered fill may be used to support the proposed structure."   The report included specific design and construction recommendations for the foundation systems, pavements, and other earth-related phases of the project should the owner choose the alternate method.  These recommendations were

---

[1] Primrose constructs, develops, and manages independent and assisted living facilities.  Gillette Retirement is an independent group of investors who own the facility and contract with Primrose for management services.

1

intended to result in construction that would allow a tolerance of one inch of differential movement. Primrose chose the alternate construction method.

[¶4]    Primrose selected Ghidorzi as the general contractor for the project. The construction contract (Contract) was signed on September 11, 2009. The Contract specifically excludes the Terracon Report as part of the Contract but contains a drawing with an annotation that states the Terracon soils report specifications must be strictly adhered to. The project was completed in 2010. In 2011, Primrose noticed some movement of the slabs and walls in and near the water service room where the water main entered the building (Area A). Primrose notified Ghidorzi of the problem and a Ghidorzi representative was sent to inspect the situation. After its inspection, Ghidorzi wrote to Primrose stating it had tested the soils and there was an increase in water saturation in Area A. It also pointed out that the "construction of the building is per the construction documents." Ghidorzi suggested that "[m]ovement in the building is the nature of this site when building with spread footings."

[¶5]    The problems continued to escalate into 2012 when Primrose contacted the City of Gillette. The City pressure-tested the water main for a leak but did not find one. The soil movement continued to cause cracks and separation in the floors and walls of the building. Primrose observed heavy ground saturation in the vicinity of the water service room and evidence of standing and subsurface water. In September 2013, Primrose again contacted the City and the City conducted another pressure test. This time it identified a leak where the service line connected to the water main just outside the water service room. At roughly the same time, Primrose excavated the affected area and discovered water was "gushing [and] boiling up into the holes." An inspection of the service line installed by a Ghidorzi subcontractor revealed the leak was at the "T" connection between the service line and the City water line. The connection was missing "all thread" necessary to hold the pipes together. The connection was repaired but the differential movement continued.

[¶6]    On April 7, 2016, Primrose filed a complaint against Ghidorzi alleging negligence, breach of contract, and breach of the implied covenant of good faith and fair dealing. Primrose also alleged negligence claims against the City of Gillette. Primrose later amended its complaint to add claims against WAI, the architect, who, in turn, brought a third-party complaint against Ghidorzi's engineering subcontractor. Eventually, all claims against the entities named in the action—except Ghidorzi—were dismissed by stipulation. Ghidorzi moved for summary judgment on all of Primrose's claims on May 15, 2020.

[¶7]    After a hearing, the district court granted summary judgment in favor of Ghidorzi.[2] Relevant to this appeal, the district court concluded the Terracon Report was excluded from the Contract documents, Primrose failed to establish evidence demonstrating that Ghidorzi's alleged breach caused Primrose damages, and the duty of good faith and fair

_____

[2] Primrose does not appeal from the summary judgment awarded on the negligence claim.

2

dealing was inapplicable because the duties of the parties were fully incorporated through the terms of the Contract.

## *STANDARD OF REVIEW*

[¶8]    Our standard of review on summary judgment is well established:

> A grant of summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  W.R.C.P. 56(a).
>
> This Court reviews a district court's order granting summary judgment de novo and may affirm on any basis in the record.
>
> > [W]e review a summary judgment in the same light as the district court, using the same materials and following the same standards.  We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record.  A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties.
>
> The movant bears the initial burden of establishing a prima facie case for summary judgment using admissible evidence.  If the movant establishes a prima facie case for summary judgment, the burden shifts to the opposing party to present admissible evidence demonstrating a genuine dispute of material fact for trial.

*Peterson v. Meritain Health, Inc.*, 2022 WY 54, ¶¶ 14–16, 508 P.3d 696, 704 (Wyo. 2022) (internal citations and quotation marks omitted); *see also* W.R.C.P. 56(c) (requiring evidence supporting and opposing summary judgment to be admissible).

[¶9]    The parties agree that the claims arising from the Contract are reviewed under South Dakota law.  "Contract interpretation is a question of law reviewed de novo."  *Prunty Constr., Inc. v. City of Canistota*, 2004 SD 78, ¶ 10, 682 N.W.2d 749, 753 (citing *Fenske Media Corp. v. Banta Corp.*, 2004 SD 23, ¶ 8, 676 N.W.2d 390, 393).  The intent of the parties is ascertained from the contract's language and, to the extent possible, "we must

3

give meaning to all the provisions of a contract." *Id.* (quoting *Fenske*, ¶ 8, 676 N.W.2d at 393).

## DISCUSSION

### I.  Did the district court err in granting summary judgment on Primrose's breach of contract claim?

[¶10] Primrose contends the district court erred in granting summary judgment on the breach of contract claim because it failed to recognize a material issue of fact as to whether Ghidorzi breached the Contract by failing to follow the specifications from the Terracon Report[3] incorporated into the Contract documents. Primrose also argues the district court misapplied South Dakota law and material issues of fact remain as to causation.

### A.  Terms of Contract

[¶11] It is undisputed that the Terracon Report recommended specific structural requirements and made clear these were necessary if Primrose chose the spread footing foundation option in moving forward with the project. It is also undisputed that Ghidorzi did not follow these recommendations during construction. Ghidorzi claims the specifications in the Terracon Report were directly and unambiguously excluded from the Contract requirements by the Project Manual, Division 2, Section 02010, 1.2, which states, "[the Terracon] report is not a part of the Contract Documents." Primrose disagrees, arguing the Terracon specifications for the spread footings were incorporated into the Contract through a drawing submitted by Ghidorzi's structural engineer on February 13, 2009, prior to the execution of the Contract. The drawing had an annotation that read, "All footings shall bear on new engineered fill as per soils report by Terracon project # A5085035. The soils report must be strictly adhered to." Ghidorzi concedes that the drawing was part of the Contract, but claims the note on a structural drawing did not modify Section 1.2 of the Project Manual. Ghidorzi admits under the terms of the Contract it was required to review the Contract documents, including the drawings, but asserts that the Contract also states that the requirement to review was "not for the purpose of discovering errors, omissions, or inconsistencies."

---

[3] The district court referred to the Terracon Report solely in relation to Primrose's claim for breach of good faith and fair dealing. It stated:

> Primrose directs the Court specifically to the Terracon geotechnical report and Ghidorzi's failure to install subsurface drainage discussed in the report, and suggests this failure violates the "spirit of the deal." However, the Terracon report was not part of the contract documents and subsurface drainage was not designed into the plans. Primrose sued its architect for that failure. Ghidorzi followed the contract documents and there [was] nothing to show they did so in bad faith . . . .

4

[¶12]   "[T]he interpretation of a contract is a question of law, which is reviewed de novo." *Koopman v. City of Edgemont by Dribble*, 2020 SD 37, ¶ 14, 945 N.W.2d 923, 926–27, *reh'g denied* (Aug. 4, 2020) (quoting *Weitzel v. Sioux Valley Heart Partners*, 2006 SD 45, ¶ 18, 714 N.W.2d 884, 892).  "If in dispute, however, the existence and terms of a contract are questions for the fact finder." *Id.* (quoting *Behrens v. Wedmore*, 2005 SD 79, ¶ 20, 698 N.W.2d 555, 566 (quoting *Morrisette v. Harrison Int'l Corp.*, 486 N.W.2d 424, 427 (Minn. 1992))).

[¶13]   Primrose asserts that, at minimum, the conflicting provisions in the Contract create an ambiguity which must be decided by the jury.  "[A] contract is not rendered ambiguous simply because the parties do not agree on its proper construction or their intent upon executing the contract." *Gail M. Benson Living Tr. v. Physicians Off. Bldg., Inc.*, 2011 SD 30, ¶ 11, 800 N.W.2d 340, 343 (quoting *Pesicka v. Pesicka*, 2000 SD 137, ¶ 10, 618 N.W.2d 725, 727).  "Rather, a contract is ambiguous only when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Benson Living Tr.*, ¶ 11, 800 N.W.2d at 343 (quoting *Pesicka*, ¶ 10, 618 N.W.2d at 727); *Edgar v. Mills*, 2017 SD 7, ¶ 26, 892 N.W.2d 223, 230 ("A contract is ambiguous when application of rules of interpretation leave[s] a genuine uncertainty as to which of two or more meanings is correct." (quoting *Ziegler Furniture & Funeral Home, Inc. v. Cicmanec*, 2006 SD 6, ¶ 16, 709 N.W.2d 350, 355)).  An ambiguity is determined by examining "the language of an agreement as a whole to determine the terms and conditions." *Edgar*, ¶ 26, 892 N.W.2d at 230 (citing *Poeppel v. Lester*, 2013 SD 17, ¶ 16, 827 N.W.2d 580, 584).  The Court will not rewrite the parties' contract or add to its language in ascertaining the parties' intent. *Detmers v. Costner*, 2012 SD 35, ¶ 21, 814 N.W.2d 146, 151.  "Contracting parties are held to the terms of their agreement, and disputes cannot be resolved by adding words the parties left out." *Gettysburg Sch. Dist. 53-1 v. Larson*, 2001 SD 91, ¶ 11, 631 N.W.2d 196, 200–01.

[¶14]   The Contract between Primrose and Ghidorzi encompassed numerous documents.  The following provisions are relevant to our discussion.

[¶15]   The General Conditions of the Contract, Section 00700 states:

> 1.01   CONDITIONS OF THE CONTRACT
>
> Primrose General Conditions of the Contract for Construction, is hereby made a part of this Project Manual except as it may be modified or amended herein.
>
> Related items contained within this Project Manual include administrative and work related items which

may amend, expand upon, or modify specific Articles or paragraphs of the General Conditions for this project.

## ARTICLE 1: GENERAL PROVISIONS

### 1.1    BASIC DEFINITIONS

### 1.1.1    THE CONTRACT DOCUMENTS

The Contract Documents consist of the Agreement between Primrose and Contractor (hereinafter the Agreement), Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of the Contract, other documents listed in the Agreement and Modifications issued after execution of the Contract. A Modification is (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Architect. Unless specifically enumerated in the Agreement, the Contract Documents do not include other documents such as bidding requirements . . . .

### 1.1.2    THE CONTRACT

The Contract Documents form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification.

.    .    .

### 1.1.5    THE DRAWINGS

The Drawings are the graphic and pictorial portions of the Contract Documents showing the design, location and dimensions of the Work, generally including plans, elevations, sections, details, schedules and diagrams.

### 1.1.6    THE SPECIFICATIONS

The Specifications are that portion of the Contract Documents consisting of the written requirements for materials, equipment, systems, standards and

6

workmanship for the Work, and performance of related services.

**1.1.7  THE PROJECT MANUAL**
The Project Manual is a volume assembled for the Work which may include the bidding requirements, sample forms, Conditions of the Contract and Specifications.

**1.2  CORRELATION AND INTENT OF THE CONTRACT DOCUMENTS**

**1.2.1**  The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor.  The Contract Documents are complimentary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results.

.   .   .

**1.4  INTERPRETATION**

.   .   .

**1.4.2**  If there is an inconsistency in the quality or quantity of Work indicated in the Contract Documents the better quality and quantity shall be provided in accordance with the Architect's interpretation.

.   .   .

**ARTICLE 3: CONTRACTOR**

.   .   .

**3.1.2**  The Contractor shall perform the Work in accordance with the Contract Documents.

.   .   .

**3.2 REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR**

**3.2.1** Since the Contract Documents are compl[i]mentary, before starting each portion of the Work, the Contractor shall carefully study and compare the various Drawings and other Contract Documents relative to that portion of the Work, as well as information furnished by Primrose . . . , shall take field measurements of any existing conditions related to that portion of the Work and shall observe any conditions at the site affecting it. These obligations are for the purpose of facilitating construction by the Contractor and are not for the purpose of discovering errors, omissions, or inconsistencies in the Contract Documents, however, any errors, inconsistencies or omissions discovered by the Contractor shall be reported promptly to the Architect or Primrose's designated representatives as a request for information in such form as the Architect may require.

**3.2.1.1** The Contractor shall carefully study and compare the Contract Documents with the existing conditions at the job site and shall immediately report to the Architect or Primrose's designated representatives, in writing, any error, inconsistency or omission that the Contractor may discover, or any materials or systems that the Contractor has reason to believe are incorrect, inadequate, obsolete or unsuitable for the purpose indicated, or that the Contractor has reason to believe would constitute or result in a violation of the Contractor's warranty or applicable law. The Contractor shall not proceed until written instructions are received from the Architect or Primrose's designated representatives. The Contractor shall bear full responsibility for any additional costs, delays or damages resulting from failure to immediately report[] any such errors, inconsistencies or omissions that the Contractor may discover.

**3.2.2** Any design errors or omissions noted by the Contractor during this review shall be reported promptly to Primrose and the Architect, but it is recognized that the Contractor's review is made in the Contractor's

8

capacity as a contractor and not as a licensed design professional unless otherwise specifically provided in the Contract Documents.

.　.　.

**3.5　WARRANTY**

**3.5.1**　The Contractor warrants to Primrose and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective.

.　.　.

**ARTICLE 13: MISCELLANEOUS PROVISIONS**

**13.1　GOVERNING LAW**

**13.1.1** The Contract shall be governed by the laws of the State of South Dakota, without giving effect to conflicts of laws principles, unless otherwise mutually agreed.

[¶16]　The Project Manual provides:

**ARTICLE 1: THE CONTRACT DOCUMENTS**

The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either

9

written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 8.

. . .

**ARTICLE 8: ENUMERATION OF CONTRACT DOCUMENTS**

**8.1** The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

**8.1.1** The Agreement is this executed Form of Agreement between Primrose and Contractor; and

**8.1.2** Project Manual and Project Specifications contained in the Project Manual dated February 13, 2009, Architects Job No. 92008.19; and

**8.1.3** **Drawings dated February 13, 2009** and addendum # 1 dated May 19, 2009; and

**8.1.4** The Supplementary and other Conditions of the Contract, if any.

(Emphasis added.)

[¶17] Section 02010 of the Project Manual is entitled "**SUBSURFACE INVESTIGATION**" and states:

**1 PART 1 GENERAL**

1.1    SCOPE

A.    This section includes soil investigation report:
1.    A soils investigation report has been prepared for the site of this Work.
2.    A copy is bound herein following this section.

. . .

1.2    COORDINATION

    A.    Use of data:
        1.    **This report is not a part of the Contract Documents.**
        2.    The report is available for bidders' information, but is not a warranty of subsurface conditions.
        3.    Bidders should visit the site and acquaint themselves with existing conditions.
        4.    Prior to bidding, bidders may make their own subsurface investigations to satisfy themselves as to site and subsurface conditions, but such investigations may be performed only under time schedules and arrangements approved in advance by the Architect.

.   .   .

1.3    QUALITY ASSURANCE

    A.    A soil engineer will be retained by the Contractor to observe performance of work in connection with excavating, trenching, filling, backfilling, and grading, and to perform compaction tests.

    B.    Readjust work performed that does not meet technical or design requirements, but **make no deviation from the Contract Documents without specific and written approval from the Architect**.

(Emphasis added.)

[¶18]   The Enumeration of Contract Documents in Article 8.1.3 of the General Conditions specifically incorporates the February 13, 2009 drawing as a contract document. The drawing itself clearly noted that the specifications of the Terracon Report regarding spread footings must be "strictly" followed. The South Dakota court has recognized that, in the context of purchase agreements, the contract:

"may incorporate by reference another document containing technical specifications for the product, *and this will likely create an express warranty by description*." 67A Am. Jur. 2d

11

*Sales* § 739 (1985) (emphasis added). *See White's Elec., Heating, Air & Plumbing v. Lewis Constr. Co.*, No. 02A01-9803-CH-00064, 1999 WL 605654, at \*13 (Tenn. Ct. App. 1999) (stating that neither physical attachment nor specific language is necessary to incorporate a document by reference; "[t]he incorporating instrument must clearly evidence an intent that the writing be made part of the contract"); *U.S. v. Outer Harbor Dock & Wharf Co.*, 124 F. Supp. 337, 343 (S.D. Cal. 1954) (holding that a contract may refer to another contract for details or conditions and that the contract referred to must be considered as a part of the contract in which the reference was made).

*James River Equip. Co. v. Beadle Cnty. Equip., Inc.*, 2002 SD 61, ¶ 21, 646 N.W.2d 265, 269. The drawing made specific reference to the Terracon Report and by stating that these requirements be "strictly" followed clearly evidenced an intent to make the specifications part of the Contract. On the other hand, Article 1.2.1 of the Project Manual excludes the Terracon Report, which was submitted for bidding purposes, from the Contract documents.

[¶19] We are not persuaded by Ghidorzi's claim that Article 3.2.1 of the Project Manual relieved Ghidorzi of any obligation to notify Primrose or the architect of its decision to ignore the note on the structural drawing. Ghidorzi was obligated to "promptly" report "any errors, inconsistencies or omissions *discovered* by the Contractor" through "a request for information in such form as the Architect may require." *See also* Article 3.2.2—Contractor's review obligation (risk allocation); 2 Philip Bruner & Patrick O'Conner, Jr., *Bruner and O'Connor on Construction Law* § 5.67 (2020). In addition, Section 1.3 B of the Project Manual requires Ghidorzi to "make no deviation from the Contract Documents without specific and written approval from the Architect." At this stage of the proceedings, there is nothing in the record to establish Ghidorzi did not discover the inconsistency or the basis for Ghidorzi's decision to proceed without incorporating the engineer's drawing note.

[¶20] We conclude that the Contract provisions, read as a whole, are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Benson Living Tr.*, ¶ 11, 800 N.W.2d at 343 (quoting *Pesicka*, ¶ 10, 618 N.W.2d at 727). "[W]hen there is an ambiguous contract, evidence must be introduced to determine what the intentions of the parties were and . . . such evidence creates a question of fact, which must be resolved by the jury." *Id.* ¶¶ 11–16, 800 N.W.2d at 343–44 (citations omitted). Because we have determined that the Contract is ambiguous concerning the treatment of the Terracon Report, it is appropriate to reverse and remand the district court's grant of summary judgment to allow the introduction of evidence regarding the intentions of the parties.

**B. Causation**

[¶21]  The district court granted summary judgment to Ghidorzi on Primrose's breach of contract claim based on Primrose's failure to submit evidence that Ghidorzi's alleged breach caused Primrose's damages.  The district court found that Primrose had not shown how their loss was clearly ascertainable because it sued various parties; it presented only various possibilities as to the source of water that caused the swelling soils; and Primrose took the risk of potential damage when it chose to incorporate a spread footing foundation. It further found that deposition testimony establishes Ghidorzi met the standard of care and did not demonstrate the damages were caused by Ghidorzi's actions.

[¶22]  Primrose argues the district court misapplied South Dakota law and the record creates an issue of material fact as to causation.  Ghidorzi maintains that under South Dakota law, Primrose's failure to identify the source of the water causing the soil to swell defeats their claim.

[¶23]  In South Dakota, "[t]he elements of a breach of contract are (1) an enforceable promise; (2) a breach of the promise; and (3) resulting damages." *Shaw v. Wasko*, No. 4:22-CV-04054-KES, 2022 WL 3369297, at *8 (D.S.D. Aug. 16, 2022) (quoting *Bowes Constr., Inc. v. S. Dakota Dep't of Transp.*, 2010 SD 99, ¶ 21, 793 N.W.2d 36, 43).  To recover damages for breach of contract, the loss must be clearly ascertainable in both its nature and origin.  S.D. Codified Laws § 21-2-1.[4]  "Essential to proving contract damages is evidence that damages were in fact caused by the breach." *McKie v. Huntley*, 2000 SD 160, ¶¶ 18–19, 620 N.W.2d 599, 603–04.

[¶24]  Proximate cause was defined by the South Dakota Supreme Court in *Garrido v. Team Auto Sales, Inc.*:

> Proximate cause is defined as a cause that produces a result in a natural and probable sequence and without which the result would not have occurred.  This Court has further defined proximate cause as an immediate cause and which, in natural or probable sequence, produced the injury complained

---

[4] South Dakota statutes provide:

> 21-2-1.  **General measure of damages for breach of contract-- Uncertain damages not recovered.**
> For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.  **No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and their origin.**

S.D. Codified Laws § 21-2-1 (2022) (second emphasis added).

of. Furthermore, for proximate cause to exist, the harm suffered must be found to be a foreseeable consequence of the act complained of. Causation is generally a question of fact for the jury except when there can be no difference of opinion in the interpretation of the facts. It must be a clear case before a trial judge is justified in taking these proximate cause issues from the jury. Moreover, [a] mere surmise that a party will not prevail at trial is not a sufficient basis to grant summary judgment.

*Garrido v. Team Auto Sales, Inc.*, 2018 SD 41, ¶ 16, 913 N.W.2d 95, 100 (internal citations and quotation marks omitted).

[¶25] Ghidorzi suggests that because *Garrido* was a negligence case, it is not applicable to the breach of contract claims in this case. It argues "a higher degree of proof" is required to obtain damages under South Dakota contract law. It cites to two cases for this proposition—*Peska Properties, Inc. v. N. Rental Corp.*, 2022 SD 33, ¶ 22, 976 N.W.2d 749, 756; *ISG, Corp. v. PLE, Inc.*, 2018 SD 64, ¶ 34, 917 N.W.2d 23, 34.

[¶26] In *Peska*, a commercial landlord (Peska) sued for damages after lessees defaulted on their lease agreement. After a bench trial, the circuit court awarded damages using a "blended rate" formula to determine damages. Peska appealed, contending that the circuit court erred as a matter of law in determining that a "blended rate" was the commercially reasonable calculation for damages rather than calculating the damages based upon the actual loss sustained by Peska under the lease. *Peska*, ¶ 21, 976 N.W.2d at 755–56. Peska also claimed the circuit court's proportional award for the cost of a build-out was an error of law because it failed to meet the ultimate goal of a damage award—to return Peska to the position it would have occupied if the contract had been performed. The South Dakota Supreme Court agreed with Peska noting damages for a breach of contract "must be reasonably certain and not speculative." *Id.* ¶ 22, 976 N.W.2d at 756.

[¶27] In *ISG*, ISG brought action against portable lift manufacturer, PLE, for breach of contract, fraud, and fraudulent misrepresentation after PLE delivered contractually noncompliant tactical observation platforms for use by law enforcement at a festival in Puerto Rico. After the jury found in favor of ISG and awarded compensatory and punitive damages, PLE moved for a new trial. The circuit court entered judgment on jury verdict for ISG as to liability but granted new trial as to damages. ISG appealed and the South Dakota Supreme Court reversed, holding the evidence was sufficient to support the jury's award in all respects. *ISG*, ¶¶ 1, 41, 917 N.W.2d at 26, 35–36.

[¶28] In affirming the damages under the fraud claim, the South Dakota Supreme Court distinguished the award for contract claims from the award for fraud claims:

SDCL 21-3-1 provides that "[f]or the breach of any obligation not arising from contract, the measure of damages . . . is the amount which will compensate for all the detriment proximately caused thereby, *whether it could have been anticipated or not*." Further, "courts have some leeway in calculating damages and a lesser degree of certainty is required to prove tort damages as compared to contract damages." [*Weekley v.*] *Prostrollo*, 2010 S.D. 13, ¶ 24, 778 N.W.2d [823,] 830. However, "facts must exist and be shown by the evidence which afford a basis for measuring the loss of the plaintiff with reasonable certainty." *Id.* ¶ 26.

*ISG*, ¶ 34, 917 N.W.2d at 34.

[¶29] Contrary to Ghidorzi's argument, neither of these cases discuss causation or a higher standard of proof of causation at the summary judgment stage. Rather, they address the measure of damages and the evidentiary certainty necessary to prove damages. This is not the issue here. Both parties concede that the amount of damages is an issue of fact for trial. Ghidorzi does not direct us to a case which requires a higher degree of proof of proximate cause in a contract case as compared to a negligence case. We therefore rely on the definition set forth by the South Dakota Supreme Court in *Garrido*.

[¶30] Ghidorzi asserts that without definitive evidence of the origin of the water that resulted in swelling soils, Primrose cannot demonstrate that Ghidorzi's actions or inaction caused Primrose's damages. Primrose argues that Ghidorzi misinterprets its claim. It is undisputed that the long-term exposure to moisture caused the differential movement. Primrose maintains it submitted evidence of more than one potential source of the water, such as the water leak in the mainline servicing the building in Area A, sprinkler heads located too close to the building, inadequate and negative grading around the building, and runoff from downspouts, all contrary to the requirements of the Contract documents. It claims that had Ghidorzi followed the specifications in the Contract documents as incorporated by reference in the engineering drawing, the amount of water in the soil, no matter the source, would have been reduced and the damage would have been limited to a 1 to 1.1 inch of differential movement as opposed to the 3-inch shift found in Area A. Primrose cites to the deposition testimony of its expert, Joe Hall, a structural engineer employed by KL&A, Inc., as evidence of causation. He prepared a report where he concluded:

Foundation and slab on grade movement is most typically caused by a change(s) in moisture in the soils supporting the foundation and slabs on grade. Presence of expansive clays exacerbates the potential movement. The Geotechnical Report allowed spread footing foundation system

15

with over-excavation and import of structural fill that was ultimately utilized on the project. For over-excavation, the Geotechnical Report provided an estimate of differential slab movement of 1" provided the measures laid out in the Report were followed to minimize the chance of moisture intrusion in the sensitive soils beneath the building. Differential movements of upwards of 2" to 3" were observed in areas of the building.

.   .   .

As recommended in the Geotechnical Report, a subsurface drainage system beneath the slab and around the perimeter of the foundation is a common way to minimize the potential of increased moisture content from an external source of water . . . . There was no indication of a subsurface drainage system in the construction documents, nor in any of the test pits dug around the perimeter of the building.

It is KLA's professional opinion that a majority of the interior slabs on grade and interior column foundation movement, stresses, and cracks observed were caused by the swelling of the underlying clay soils that underwent an increase in moisture content. Interior footings appear to have less than the recommended structural fill specified in the Geotechnical Report, especially at the interior garage footings. The lack of structural fill causes these footings to be more susceptible to movement due to expansive soils. The exterior foundation wall movement and lateral rotation along the south side of the garage, and to a lesser extent, the exterior west wall of Area C, were indicative of differential movement of the footing due to eccentric loading of the wall, lateral swell pressures and varying moisture levels in the soils adjacent to and beneath the foundation wall and footings.

The leak in the waterline discussed earlier in this report, the lack of positive drainage as called for by the Geotechnical Report, the lack of proper structural fill depths beneath footings, and the failure to locate the sprinkler heads away from the building the minimum distance called for by the Geotechnical Report have contributed to the increase in moisture content that has resulted in the differential movement of the building.

The intersection of exterior load bearing walls and interior non-load bearing walls were not constructed in a manner to allow differential movement between the slabs on grade and the foundations as recommended in the Geotechnical Report. The lack of slip joints has resulted in large cracks and extensive damage at the joints.

Also, by casting the interior bearing wall footings integrally with the concrete slabs-on-grade, there is no isolation of the slab-on-grade from the interior footings. Therefore, any differential movement seen by the lightly loaded slab-on-grade is also seen by the interior footings, the walls supported by these footings, and in turn, the upper-level framing. The integral footing system does not follow the Geotechnical Report recommendation of isolating the slabs-on-grade from foundation elements to allow independent movement of the slabs-on-grade.

There are also several instances that the construction observed did not match that shown in the structural plans. For example, some hold-downs were missing and others were not placed as shown in the structural plans. Interior strip footings appeared to be less than the specified width (or placed off-center) and depth. The slabs-on-grade appeared void of any reinforcement in locations where visible (cracks, borings, and test pits). Each of these, though not likely a primary cause of damage, contribute to the extent in which the damage has occurred.

[¶31] At his deposition, Mr. Hall testified:

> Q. The areas where we see this movement to this degree, 2 to 3 inches, is it fair to say that it's primarily in the south garage or south side area?
> A. That is correct.
> Q. Okay. The Terracon report said that there could—you could expect movement of up to an inch; correct?
> A. Correct. If all of the . . . recommendations were followed, yes.

[¶32] Mr. Hall's report identifies specific deviations from the Contract documents (assuming the jury determines the parties' intention was to include the Terracon

17

specifications as noted in the drawing) and that these deviations contributed to Primrose's damages.

[¶33] Ghidorzi points to the fact that Primrose sued several entities and that the ultimate cause of the damages was Primrose's decision at the outset to use the alternative spread footing foundation. The fact that Primrose alleged several entities caused their damages does not defeat its breach of contract claims against Ghidorzi. *See Krause v. Reyelts*, 2002 SD 64, ¶¶ 19–22, 646 N.W.2d 732, 735–36 (release of claims against one subcontractor did not prevent suit against general contractor for its own deficient work); *W. Nat'l Mut. Ins. Co. v. Gateway Bldg. Sys., Inc.*, 2016 SD 85, ¶ 13, 887 N.W.2d 887, 891–92 (summary judgment is premature when underlying liability of several entities has not been determined, and the defendant has disputed whether it was solely responsible for the ultimate cause of the damages); 11 Joseph M. Perillo, *Corbin on Contracts* § 55.9 (2005). Ghidorzi also claims it is **undisputed** that Primrose's damages "were caused by Plaintiffs' own design decisions rather than an increase in moisture content beneath the building that caused the soils to swell." We find no basis in the record for this contention.

[¶34] On summary judgment, "[a]ll reasonable inferences drawn from the facts must be viewed in favor of the non-moving party. The burden is on the moving party to clearly show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law." *Benson Living Tr.*, ¶ 9, 800 N.W.2d at 342–43 (quoting *W. Consol. Co-op. v. Pew*, 2011 SD 9, ¶ 19, 795 N.W.2d 390, 396); *see also Peterson*, ¶¶ 14–16, 508 P.3d at 704. Viewing the evidence in favor of Primrose, we conclude the district court erred in granting summary judgment of the issue of causation.

## II.     Did the district court err in granting summary judgment on Primrose's breach of the implied covenant of good faith and fair dealing?

[¶35] Primrose contends the district court erred in granting summary judgment on its claim that Ghidorzi violated the duty of good faith and fair dealing. Primrose argues that Ghidorzi reviewed the Terracon Report during the bidding process and knew that the specifications for the spread footings were essential to mitigate the effects of any increase in water content. It claims Ghidorzi's failure to follow those specifications denied it "the benefit of its justified expectations" in having the report followed.

[¶36] South Dakota recognizes that "[e]very contract contains an implied covenant of good faith and fair dealing [that] prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract." *Nygaard v. Sioux Valley Hosps. & Health Sys.*, 2007 SD 34, ¶ 20, 731 N.W.2d 184, 193–94 (citations omitted).

> This duty of good faith permits an aggrieved party to bring a breach of contract action when the other party:

[B]y [its] lack of good faith, limited or completely prevented the aggrieved party from receiving the expected benefits of the bargain. A breach of contract claim is allowed even though the conduct failed to violate any of the express terms of the contract agreed to by the parties.

*Id.* ¶ 21, 731 N.W.2d at 194 (quoting *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 841 (S.D. 1990)). "Ultimately, the duty 'emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Id.* (quoting *Garrett*, 459 N.W.2d at 841 (citing Restatement (Second) of Contracts § 205 cmt. a (Am. Law Inst. 1981))).

[¶37] Nonetheless, "the duty of good faith and fair dealing 'is not a limitless duty or obligation.'" *Id.* ¶ 22, 731 N.W.2d at 194 (quoting *Garrett*, 459 N.W.2d at 841). It "does not create an amorphous companion contract with latent provisions to stand at odds with or in modification of the express language of the parties' agreement." *Id.* (quoting *Farm Credit Servs. of Am. v. Dougan*, 2005 SD 94, ¶ 9, 704 N.W.2d 24, 28). "The implied obligation 'must arise from the language used or it must be indispensable to effectuate the intention of the parties.'" *Id.* (quoting *Garrett*, 459 N.W.2d at 841). "'[I]f the express language of a contract addresses an issue, then there is no need to construe intent or supply implied terms' under the implied covenant." *Id.* (quoting *Dougan*, ¶ 10, 704 N.W.2d at 28).

[¶38] As discussed above, Primrose raised material issues of fact regarding the intentions of the parties regarding the Terracon Report as a contract document and whether it had a duty to inform Primrose of the decision to forego strict compliance with the specifications of the Terracon Report. In addition, Primrose raised a material issue of fact as to whether the failure to comply with the specifications caused its injury. If Ghidorzi is found liable, the damages are contained in the Contract itself. Consequently, the jury will decide these questions as a matter of contract and there is no need to supply implied terms. We affirm the grant of summary judgment in favor of Ghidorzi on Primrose's claim for a breach of the duty of good faith and fair dealing.

## CONCLUSION

[¶39] There are material questions of fact precluding summary judgment on the interpretation of the Contract and whether Ghidorzi's actions contributed to Primrose's damages. The district court did not err in granting summary judgment of the breach of good faith and fair dealing claim. We affirm the summary judgment of the good faith and fair dealing claim but reverse and remand the remaining contract claim for further proceedings.