# IN THE SUPREME COURT, STATE OF WYOMING

## 2023 WY 109

**OCTOBER TERM, A.D. 2023**

November 9, 2023

WEST AMERICAN INSURANCE
COMPANY, an Indiana company,

Appellant
(Plaintiff),

v.

S-23-0052

BLACK DOG CONSULTING INC., a
Wyoming corporation d/b/a C.H. YARBER
CONSTRUCTION, a Wyoming corporation,

Appellee
(Defendant).

*Appeal from the District Court of Laramie County*
*The Honorable Peter H. Froelicher, Judge*

*Representing Appellant:*
Richard R. Rardin, Denver, Colorado.

*Representing Appellee:*
Blaine F. Burgess and Sean W. Scoggin, Williams, Porter, Day & Neville, P.C.
Cheyenne, Wyoming. Argument by Mr. Burgess.

*Before FOX, C.J., KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]    West American Insurance Company (West) is the insurer of Profile Properties' (Profile) commercial property in Cheyenne.  Black Dog Consulting Inc., doing business as C.H. Yarber Construction (C.H. Yarber), was the tenant leasing Profile's commercial property when the property sustained significant damage from a fire.  West covered Profile's fire damages and proceeded against C.H. Yarber in subrogation asserting claims of negligence and breach of contract.  The district court granted summary judgment in favor of C.H. Yarber after concluding West could not pursue its claims in subrogation because C.H. Yarber was a co-insured under Profile's insurance policy.  We affirm, concluding C.H. Yarber and Profile reasonably expected under the terms of their lease agreement that Profile would look only to its insurer, West, for compensation for fire loss. West therefore cannot pursue its claims against C.H. Yarber in subrogation.

*ISSUE*

[¶2]    West raises one issue, which we simplify and rephrase as:

> Whether West is precluded from filing claims in subrogation
> against C.H. Yarber.

*FACTS*

[¶3]    The material facts are undisputed.  C.H. Yarber entered into an agreement with Profile in 2014 to lease property in Cheyenne.  The leased property contained an office facility, two warehouses, and approximately 3.5 acres of fenced yard space encompassing the buildings.  Pursuant to the lease agreement, in addition to the $7,000 monthly rent, C.H. Yarber agreed to pay the full expense of Profile's blanket insurance policy, which included general commercial liability insurance and "[f]ire and extended coverage insurance on the Building[.]"  Profile agreed to furnish a copy of the blanket insurance policy with the invoiced expense to C.H. Yarber.  The details of the lease will be discussed below as necessary.

[¶4]    C.H. Yarber ran a metal fabrication business on the leased property that involved the welding, cutting, and grinding of metal.  In the late afternoon on December 5, 2016, C.H. Yarber's employees detected a fire on the property and called the Laramie County Fire District No. 1 (LCFD1).  After making efforts to suppress the fire and taking thermal readings, LCFD1 determined the fire was out and left the area.  C.H. Yarber's employees left soon after.  Several hours later, the property became engulfed in flames.  The metal fabrication shop was destroyed.[1]

---

[1] The parties' factual dispute over causation is not material to our determination whether West's subrogation claims may stand.

[¶5]    West paid the damages caused by the fire in accordance with Profile's policy.  In November 2020, West filed a complaint in subrogation against C.H. Yarber alleging claims of negligence and breach of contract.  C.H. Yarber moved for summary judgment on West's claims.  In granting summary judgment, the district court adopted the rule articulated in *Sutton v. Jondahl*, 532 P.2d 478 (Okla. Civ. App. 1975) ("the *Sutton* rule"). This rule holds a tenant, as a matter of law, is an implied co-insured under their landlord's fire insurance policy unless the landlord and tenant expressly agreed otherwise.  *Id.* at 482. The district court applied the *Sutton* rule and concluded Profile's lease agreement with C.H. Yarber did not expressly require C.H. Yarber to carry fire insurance and, because C.H. Yarber was also required to pay for Profile's blanket insurance policy which covered fire losses, C.H. Yarber was an implied co-insured under Profile's policy, thus precluding West from filing its claims in subrogation.

[¶6]    West timely appealed.

## *STANDARD OF REVIEW*

[¶7]    W.R.C.P. 56(a) states "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  We review a district court's order granting summary judgment de novo and may affirm on any basis in the record.  *Gates v. Memorial Hosp. of Converse Cnty.*, 2023 WY 77, ¶ 14, 533 P.3d 493, 498 (Wyo. 2023) (citation omitted); *Primrose Ret. Cmtys., LLC v. Ghidorzi Constr. Co.*, 2023 WY 15, ¶ 8, 523 P.3d 1219, 1224 (Wyo. 2023).

> We review a summary judgment in the same light as the district court, using the same materials and following the same standards.  We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record.  A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties.

*Gates*, 2023 WY 77, ¶ 14, 533 P.3d at 498–99 (quoting *Phyllis v. McDill Revocable Tr.*, 2022 WY 40, ¶ 16, 506 P.3d 753, 759–60 (Wyo. 2022)).

*DISCUSSION*

## I.      *The Subrogation Doctrine*

[¶8]   "[S]ubrogation is the substitution of one person in the place of another with reference to a lawful claim so that the one who is substituted succeeds to the rights of the other in relation to the debt or claim." *Tri-Par Invs., L.L.C. v. Sousa*, 680 N.W.2d 190, 194 (Neb. 2004) (citation omitted).  In the insurance context, "when an insurer pays the claim of its insured, the insurer stands in the shoes of its insured, and the insurer may bring a subrogation action against the tortfeasor to recover the amounts paid under the insurance policy." *State Farm Florida Ins. v. Loo*, 27 So. 3d 747, 748 (Fla. Dist. Ct. App. 2010) (citation omitted).  The purpose of the subrogation doctrine is "to prevent the party primarily liable on the debt from being unjustly enriched when someone pays his debt." *Rausch v. Allstate Ins.*, 882 A.2d 801, 807 (Md. 2005) (citation omitted).

[¶9]   The doctrine of subrogation is equitable in nature, thus "in determining whether an insurer may bring a subrogation action in a particular case, courts must weigh 'the principles of equity and good conscience.'"  *LBM Realty, LLC v. Mannia*, 19 N.E.3d 379, 386 (Ind. Ct. App. 2014) (quoting *RAM Mut. Ins. v. Rohde*, 820 N.W.2d 1, 16 (Minn. 2012)); *Dattel Fam. Ltd. P'ship v. Wintz*, 250 S.W.3d 883, 887 (Tenn. Ct. App. 2007) ("Subrogation is not appropriate in every circumstance; as an equitable doctrine, it is applied only if its application achieves equity under the facts and circumstances of the case at hand." (citation omitted)).  Importantly, an insurer "may not maintain a subrogation action against its own insured even if the insured's negligence caused the loss." *Loo*, 27 So.3d at 748 (citations omitted); *see also Sousa*, 680 N.W.2d at 194 (citation omitted); 46A C.J.S. *Insurance* § 2022 (Aug. 2023 update).

## II.      *Three Approaches: Anti-Subrogation (the* Sutton *rule), Pro-Subrogation (the anti-*Sutton *rule), and Case-by-Case Analysis*

[¶10]  For almost fifty years courts across the country have considered the issue of when a landlord's insurer can pursue a subrogation claim against a tenant who negligently caused a fire loss. *See generally Ro v. Factory Mut. Ins.*, 260 A.3d 811, 815–18 (N.H. 2021); *Liberty Mut. Fire Ins. v. Auto Spring Supply Co.*, 59 Cal. App. 3d 860, 865–67 (Cal Ct. App. 1976).  Three different approaches have emerged. *Hoosier Ins. v. Riggs*, 92 N.E.3d 685, 688 (Ind. Ct. App. 2018) (quoting *LBM Realty, LLC*, 19 N.E.3d at 383).  The *Sutton* rule the district court invoked is one approach.  Which approach Wyoming should adopt is a matter of first impression.

3

## A. Anti-Subrogation (the *Sutton Rule)*

[¶11] The categorical rule announced in *Sutton* provides that, as a matter of law, a tenant is an implied co-insured under the landlord's insurance policy absent an express agreement to the contrary. Thus, the landlord's insurer is precluded from filing a subrogation claim against a tenant. *Hoosier Ins.*, 92 N.E.3d at 688 (quoting *LBM Realty LLC*, 19 N.E.3d at 383). This rule has also been called the anti-subrogation approach. *Ro*, 260 A.3d at 814–15; *Joella v. Cole*, 221 A.3d 674, 678 (Pa. 2019).

[¶12] The *Sutton* court explained:

> This principle is derived from a recognition of a relational reality, namely, that both landlord and tenant have an insurable interest in the rented premises—the former owns the fee and the latter has a possessory interest. Here the landlords (Suttons) purchased the fire insurance from Central Mutual Insurance Company to protect such interests in the property against loss from fire. This is not uncommon. And as a matter of sound business practice the premium paid had to be considered in establishing the rent rate on the rental unit. Such premium was chargeable against the rent as an overhead or operating expense. And of course it follows then that the tenant actually paid the premium as part of the monthly rental.

*Sutton*, 532 P.2d at 482. The court further reasoned the landlord could have agreed to require the tenant to furnish fire insurance; however, prospective tenants ordinarily rely on the owner of the property to provide such insurance for the real property. *Id.* The court also acknowledged insurance companies themselves have accepted coverage of a tenant as "a natural thing." *Id.*

[¶13] The Connecticut Supreme Court offered an additional rationale for adopting the *Sutton* rule. It reasoned:

> [I]t would be inappropriate to create a default rule that allocates to the tenant the responsibility of maintaining sufficient insurance to cover a claim for subrogation by his landlord's insurer. Such a rule would create a strong incentive for every tenant to carry liability insurance in an amount necessary to compensate for the value, or perhaps even the replacement cost, of the entire building, irrespective of the portion of the building occupied by the tenant. That is precisely the same value or replacement cost insured by the landlord under his fire insurance policy. Thus, although the two forms of insurance

would be different, the economic interest insured would be the same. This duplication of insurance would, in our view, constitute economic waste and, in a multiunit building, the waste would be compounded by the number of tenants.

*DiLullo v. Joseph*, 792 A.2d 819, 822–23 (Conn. 2002) (citation omitted); *see also GNS P'ship v. Fullmer*, 873 P.2d 1157, 1162 (Utah Ct. App. 1994) (stating the *Sutton* rule "is the most efficient way to allocate insurance costs" (citation omitted)).

[¶14] The *Sutton* rule has not been universally adopted by state courts, but it reflects the modern trend. *Tri-Par Invs., L.L.C.*, 680 N.W.2d at 195, 197–98 (citations omitted).

## B. Pro-Subrogation (the anti-Sutton *rule*)

[¶15] The pro-subrogation approach employs reasoning contrary to that in *Sutton*. *Hoosier Ins.*, 92 N.E.3d at 688 (citation omitted); *see also Page v. Scott*, 567 S.W.2d 101, 103–04 (Ark. 1978); *U.S. Fid. & Guar. Co. v. Let's Frame It, Inc.*, 759 P.2d 819, 820 (Colo. App. 1988) (citation omitted). This approach categorically permits a landlord's insurer to bring a subrogation claim against a negligent tenant unless the parties expressly contract to the contrary. *Hoosier Ins.*, 92 N.E.3d at 688 (citation omitted). Courts applying this approach pushed back against the underlying rationales of *Sutton* holding instead that tenants should be held responsible for the consequences of their own negligence. *Joella*, 221 A.3d at 677–78. In *Page*, the Arkansas Supreme Court reasoned:

> The fiction that by paying the rent, the lessee paid the insurance premium is not appropriate. There is no evidence that appellee paid any greater rent because of the insurance than he would have paid had appellant not taken insurance. If the tenant paid the insurance premium, he also paid the taxes on the property and the cost of construction or purchase of the house, not to mention cost of repairs and maintenance. Such a fiction ignores the fact that more often than not the market, i. e., supply and demand, is the controlling factor in fixing and negotiating rents.

*Page*, 567 S.W.2d at 103–04.

[¶16] The Iowa Supreme Court also rejected the *Sutton* rationale that the landlord's fire insurance includes the interest of both landlord and tenant as a matter of law, stating this assumption "disregards the fact that these are separate estates capable of being separately valued and separately insured." *Neubauer v. Hostetter*, 485 N.W.2d 87, 90 (Iowa 1992). Courts adopting this approach have further expressed concern the *Sutton* rule "encroach[es] upon the contractual relationship between a landlord and its insurer." *Tri-Par Invs.L.L.C.*,

5

680 N.W.2d at 197 (citing *56 Associates ex rel. Paolino v. Frieband*, 89 F. Supp. 2d 189 (D. R.I. 2000)).

### C.    Case-by-Case Analysis

[¶17]   A greater number of courts have avoided categorical rules in favor of a case-by-case approach. *LBM Realty, LLC*, 19 N.E.3d at 392–93; *Rausch*, 882 A.2d at 814; *Tri-Par Invs., L.L.C.*, 680 N.W.2d at 196–98.   This more flexible approach adopts the basic underpinnings of *Sutton* but looks first to the lease, and any other admissible evidence, to determine the parties' reasonable expectations as to who should bear the risk of loss if a tenant negligently damages the leased premises. *Rausch*, 882 A.2d at 814; *Hoosier Ins.*, 92 N.E.3d at 688 (citing *LBM Realty, LLC*, 19 N.E.3d at 393–94); *Tri-Par Investments, L.L.C.*, 680 N.W.2d at 197–98.   Often a court will be able to determine the reasonable expectations of the parties from the language of the lease alone. *RAM Mut. Ins.*, 820 N.W.2d at 14–15 (citation omitted); *Rausch*, 882 A.2d at 814–15.   For instance:

> [I]f the lease indicates that the landlord has agreed to procure insurance covering a particular loss, a court "may properly conclude that, notwithstanding a general 'surrender in good condition' or 'liability for negligence' clause in the lease," the landlord and tenant reasonably expected "that the landlord would look only to the policy, and not to the tenant, for compensation for . . . loss[es] covered by the policy."   In such a case, the insurer would again not be able to maintain a subrogation action, because the landlord would be unable to sue the tenant for the damage under the lease.   If, however, a lease obligates a tenant to procure insurance covering a particular type of loss, such a provision will provide evidence that the parties reasonably anticipated that the tenant would be liable for that particular loss, which would allow another insurer who pays the loss to bring a subrogation action against the tenant.

*RAM Mut. Ins.*, 820 N.W.2d at 15 (citation omitted); *see also LBM Realty LLC*, 19 N.E.3d at 392–93 (citation omitted); *Rausch*, 882 A.2d at 816.

[¶18]   Though not presented as a subrogation claim, our reasoning in *Berger v. Teton Shadows, Inc.*, 820 P.2d 176 (Wyo. 1991) aligns with this approach.   Teton Shadows, the owner of a condominium project, hired Mr. Berger as a subcontractor to do plumbing work. *Id.* at 177.   As part of Mr. Berger's contract, Teton Shadows agreed "to carry fire, tornado and other necessary insurance." *Id.* at 177.   Mr. Berger negligently caused a fire at the project site resulting in $120,000 in damage. *Id.* at 176.   Teton Shadows' insurance carrier covered $103,000 of the damage, resulting in Teton Shadows filing a negligence action to

recover the uninsured loss. *See id.* at 176 n.1, 177. The dispute on appeal centered on whether Teton Shadows' express agreement to carry fire insurance allocated the risk of loss to the insurer and prevented Teton Shadows from recovering damages beyond the insured loss. *Id.* at 177. Quoting a Florida case that analyzed the same contractual term, we noted:

> The owner had, as all owners always have, the right to insure his own property for his own exclusive benefit without the consent or agreement of the contractor or anyone else. Therefore, the only reasonably conceivable purpose of a construction contract provision placing an obligation on the owner to carry insurance is to benefit the contractor by providing him protection and exculpation from risk of liability for the insured loss. Although the contractor was not named as an insured, nor does the contract require this to be done, the contract insurance provision is valuable to the contractor for the very purpose this case exemplifies and serves to limit the owner to insurance proceeds even though the loss was caused by the negligence of the contractor.

*Id.* at 178 (quoting *Housing Inv. Corp. v. Carris*, 389 So.2d 689 (Fla. Dist. Ct. App. 1980)). Accordingly, we looked at the plain language of Mr. Berger's contract and concluded the parties reasonably expected Teton Shadows to look only to its insurance to cover the fire loss. *See id.* We held "[t]he contract provision, owner to carry fire insurance, clearly expressed the parties' intent to shift the risk to Teton Shadows' insurance carrier." *Id.*

[¶19] Considering our reasoning in *Berger* and the relative merits of the three subrogation approaches, we, too, avoid the categorial approaches, believing instead the best analytical framework to effectuate the parties' intent with regard to allocation of risk of fire loss begins with a case-by-case look at the lease itself. *See Rausch*, 882 A.2d at 814–15; *see also Joella*, 221 A.3d at 678–79 (acknowledging the case-by-case approach best effectuates the intent of the parties "by simply enforcing the terms of their contracts"). That we favor such an approach should come as no surprise given that this Court has long employed freedom of contract principles as the foundation for resolving contractual disputes. *Finley Res., Inc. v. EP Energy E&P Co. Ltd. P'ship*, 2019 WY 65, ¶ 24, 443 P.3d 838, 846–47 (Wyo. 2019); *Colton v. Town of Dubois*, 2022 WY 138, ¶ 22, 519 P.3d 976, 982 (Wyo. 2022) ("We do not lightly interfere with this liberty." (citations omitted)). This approach moreover avoids the temptation or need for Wyoming courts to imply terms into the parties' lease or make presumptions based on conjecture. *See Tri-Par Invs., LLC*, 680 N.W.2d at 194–95, 197; *Rausch*, 882 A.2d at 814–15.

### III. *Profile's lease agreement with C.H. Yarber.*

[¶20]   We begin our analysis with fundamental contract interpretation principles. *See LBM Realty, LLC*, 19 N.E.3d at 394.   Lease agreements are contracts, and we interpret them using the same principles. *Cheek v. Jackson Wax Museum, Inc.*, 2009 WY 151, ¶ 14, 220 P.3d 1288, 1291 (Wyo. 2009) (citation omitted).   Our goal when interpreting a lease is to determine the intent of the parties. *See Colton*, 2022 WY 138, ¶ 16, 519 P.3d at 980–81 (citations omitted).   When the language of the lease is clear and unambiguous, we look only to its four corners to determine the parties' intent. *See id.* (quoting *TEP Rocky Mountain LLC v. Record T.J. Ranch L.P.*, 2022 WY 105, ¶ 45, 516 P.3d 459, 474 (Wyo. 2022)).   "We use an objective approach when interpreting contracts, thus rendering the parties' subjective intent irrelevant." *Id.* (citation omitted).   Further, we "avoid interpreting a contract so as to find inconsistent provisions or so as to render any provision meaningless." *Pope v. Rosenberg*, 2015 WY 142, ¶ 20, 361 P.3d 824, 830 (Wyo. 2015) (citation omitted).

[¶21]   Paragraph 12 of the lease directly addresses Profile's and C.H. Yarber's intent concerning risk of fire loss.   It states:

> 12. Commencing on the Commencement Date and continuing during the Term hereof, **Tenant shall bear the sole expense, under Profile Properties, LLC blanket insurance policy** and at Tenant's actual cost invoiced by Landlord, the following insurance:
>
> Property Insurance. **Fire and extended coverage insurance on the Building, improvements and fixtures on the Premises in amounts equal to the replacement cost thereof**.
>
> Liability Insurance. Commercial general liability insurance with a minimum combined single limit for bodily injury, personal injury, loss of life and property damage of not less than $1,000,000.
>
> Tenant's Insurance Policies. The original of the insurance policy or policies shall remain in possession of Landlord; provided, however, **Landlord shall deliver a copy of the policy with the invoiced amount to the Tenant upon obtaining said insurance.**   A certificate of insurance shall be issued naming Landlord as a loss payee and an additional insured on the policy or policies, as applicable and providing Landlord with thirty (30) days prior notice of any cancellation or termination of the policy or policies.   Tenant's insurance

> policies shall be deemed primary over any policy maintained by Landlord with respect to any act or omission caused by Tenant or Tenant's agents, employees or contractors. The coverage required above may be maintained under one or more blanket policies and may contain commercially reasonable deductibles.
>
> Tenant will furnish Landlord a Certificate of Insurance annually reflecting the above.

[¶22] Paragraph 12 unambiguously required Profile to obtain a blanket insurance policy that protected against fire losses in an amount equal to the replacement cost of "the Building, improvements, and fixtures on the Premises." C.H. Yarber had to pay the "sole expense" of that policy. And Profile had to provide C.H. Yarber with a copy of the blanket insurance policy along with an invoiced amount. Though the lease contains other provisions that address C.H. Yarber's general obligations to maintain the property in good condition and hold Profile harmless for property damage C.H. Yarber may cause through its negligence, this specific, plain language supports our conclusion that Profile intended to look solely to its blanket insurance policy to cover any losses from fire. *See e.g.*, *Joella*, 221 A.3d at 680 (citations omitted); *RAM Mut. Ins.*, 820 N.W.2d at 15 (citation omitted); *Rausch*, 882 A.2d at 816; *supra*, ¶ 17; *see also Berger*, 820 P.2d at 178 (citation omitted). Because the lease evidences that Profile did not intend to look to C.H. Yarber to cover the insured loss, West cannot pursue its claims against C.H. Yarber in subrogation.

[¶23] Affirmed.