# IN THE SUPREME COURT, STATE OF WYOMING

## 2024 WY 18

**OCTOBER TERM, A.D. 2023**

**February 8, 2024**

RONALD PINTHER,

Appellant
(Plaintiff),

v.

AMERICAN NATIONAL PROPERTY AND
CASUALTY INSURANCE COMPANY;
AMERICAN NATIONAL INSURANCE
COMPANY; and PHILIP MAGGARD,

Appellees
(Defendants).

S-23-0133

*Appeal from the District Court of Laramie County*
*The Honorable Steven K. Sharpe, Judge*

*Representing Ronald Pinther:*
> Bernard Q. Phelan, Phelan Law Office, Cheyenne, Wyoming. Argument by Mr. Phelan.

*Representing American National Property and Casualty Insurance Company and American National Insurance Company:*
> Amanda F. Esch and Catherine M. Young, Davis & Cannon, LLP, Cheyenne, Wyoming. Argument by Ms. Young.

*Representing Philip Maggard:*
> Robert C. Jarosh and Erin E. Berry, Hirst Applegate, LLP, Cheyenne, Wyoming. Argument by Ms. Berry.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]  Appellant, Ronald Pinther, a former insurance agent representing American National Property and Casualty Insurance Company (ANPAC) and American National Insurance Company (ANICO), filed this lawsuit against ANPAC, ANICO, and another ANPAC and ANICO agent, Philip Maggard.  Against ANPAC and ANICO, Mr. Pinther asserted claims of breach of contract, breach of the covenant of good faith and fair dealing, fraudulent inducement, promissory estoppel, civil conspiracy, and age discrimination.  Against Mr. Maggard, he asserted claims for tortious interference with contract and civil conspiracy.  The district court granted summary judgment on all claims against ANPAC and Mr. Maggard.[1]  Mr. Pinther appeals, and we affirm.

## *ISSUES*

[¶2]  Mr. Pinther offers one issue for review—whether the district court erred when it granted summary judgment.  We separate Mr. Pinther's issue into five:

1. Did the district court err in granting summary judgment on Mr. Pinther's breach of contract claim against ANPAC?

2. Did the district court err in granting summary judgment on Mr. Pinther's claim for breach of the covenant of good faith and fair dealing against ANPAC?

3. Did the district court err in granting summary judgment on Mr. Pinther's fraudulent inducement claim against ANPAC?

4. Did the district court err in granting summary judgment on Mr. Pinther's tortious interference with contract claim against Mr. Maggard?

5. Did the district court err in granting summary judgment on Mr. Pinther's civil conspiracy claims against ANPAC and Mr. Maggard?

---

[1] The district court also granted summary judgment on all claims against ANICO, except for Mr. Pinther's claim for breach of the covenant of good faith and fair dealing.  The parties later stipulated to the dismissal with prejudice of that claim and it was dismissed.  None of Mr. Pinther's claims against ANICO are at issue in this appeal.

*FACTS*

[¶3]   ANPAC and ANICO are two members of American National—a group of companies that provide insurance products.  ANPAC sells property and casualty insurance, and ANICO sells life insurance and annuities.

[¶4]   In 2011, Mr. Pinther applied to be an insurance sales agent for ANPAC and ANICO in Cheyenne, Wyoming.  Jim Gniady was an American National multiple line general agent, whose responsibilities included recruiting and training new sales agents in the region.  During the application process, Mr. Gniady gave Mr. Pinther a recruiting brochure.  The brochure summarizes various benefits available to its insurance agents, including "Retirement Compensation."  In this section, the brochure states:

> **American National**
> All first-year and renewal commissions are vested and payable to you the day you start with American National, and continue as long as renewal commissions are paid, which is generally 10 years.  There is no retirement age.
>
> **ANPAC®**
> Lifetime annuity, either single life or joint survivor based on lifetime loss ratio, length of service, and average compensation over the last 60 months.
>
> Minimum age for eligibility is 55 with at least 5 years of service and over 750 property and casualty units in force.

Each page of the brochure states, in capital letters, "FOR RECRUITING PURPOSES ONLY."

[¶5]   ANPAC and ANICO independently agreed to engage Mr. Pinther as an agent for their respective companies and each company entered into a separate agent agreement with Mr. Pinther.  The ANPAC Agent Agreement (the ANPAC Agreement) specifies, "This Agreement, with the attached Schedules and Supplements, constitutes the sole agreement and supersedes all prior Agreements between you" and ANPAC.  It provides that either party may terminate the agreement "without cause at any time by giving written notice to the other party at least thirty (30) days prior to the date fixed for termination."

[¶6]   The ANPAC Agreement outlines "Post-Termination Procedures" and provides that qualified agents will be paid "as specified in the Post-Termination Compensation Schedule," which "is attached and incorporated."  The Post-Termination Compensation Schedule contains a formula for calculating monthly post-termination payments.  The parties dispute whether the Post-Termination Compensation Schedule was attached to the

ANPAC Agreement when Mr. Pinther signed it. Mr. Pinther claims it was not attached and it was never separately given to him. ANPAC argues that regardless of whether the Post-Termination Compensation Schedule was attached, the dispute is not material.

[¶7]    Mr. Gniady testified that from the beginning Mr. Pinther's performance was disappointing both in terms of the number of policies he wrote and the quality of service he provided. Mr. Gniady received complaints from ANPAC's underwriting department because Mr. Pinther submitted applications on properties that were unacceptable risks and incorrectly wrote auto policies as "pleasure use" policies, resulting in inappropriate coverage. In addition, customers complained about Mr. Pinther. As the number of customer complaints about Mr. Pinther continued to increase, Mr. Gniady started documenting those complaints. Mr. Gniady asked his assistant general agent, Mr. Maggard,[2] to report complaints received about any American National agents in the region, including Mr. Pinther, and Mr. Maggard complied. Eventually, Mr. Gniady made ANPAC (and ANICO) aware of his concerns with Mr. Pinther's performance.

[¶8]    ANPAC chose to terminate its agreement with Mr. Pinther. On December 12, 2018, ANPAC sent Mr. Pinther a letter notifying him that his ANPAC Agreement would be terminated, effective January 17, 2019.[3]    After Mr. Pinther's agency agreement was terminated, ANPAC paid post-termination compensation in accordance with its Post-Termination Compensation Schedule.

[¶9]    Mr. Pinther filed this lawsuit, asserting claims against ANPAC and ANICO for breach of contract, breach of the covenant of good faith and fair dealing, fraudulent inducement, promissory estoppel, civil conspiracy, and age discrimination. He also asserted claims for tortious interference with contract and civil conspiracy against Mr. Maggard. ANPAC, ANICO, and Mr. Maggard moved for summary judgment on all claims. The district court granted the motion with respect to ANPAC and Mr. Maggard. Mr. Pinther appeals the district court's ruling on his breach of contract, breach of the covenant of good faith and fair dealing, fraudulent inducement, and civil conspiracy claim against ANPAC and his tortious interference with contract and civil conspiracy claim against Mr. Maggard.

---

[2] At all times relevant to this dispute, Mr. Maggard owned and operated an American National insurance agency in Cheyenne, Wyoming. He was an assistant general agent, which meant he had additional duties including training and recruiting agents in his area.
[3] ANICO also terminated its agency agreement with Mr. Pinther.

## DISCUSSION

[¶10]   Before turning to the issues, we address the threshold question of whether Wyoming or Missouri law applies in this matter.  We conclude that Missouri law applies to the contract issues and Wyoming law applies to the tort issues.

[¶11]   The ANPAC Agreement provides that the agreement's "validity, construction, and performance . . . shall be controlled by and construed under the laws of the State of Missouri."  Wyoming courts will enforce such "choice-of-law provisions and apply foreign law when doing so is not 'contrary to the law, public policy, or the general interests of Wyoming's citizens.'"  *Finley Res., Inc. v. EP Energy E&P Co., L.P.*, 2019 WY 65, ¶ 9, 443 P.3d 838, 842 (Wyo. 2019) (quoting *Res. Tech. Corp. v. Fisher Sci. Co.*, 924 P.2d 972, 975 (Wyo. 1996) (applying Pennsylvania law to claims of breach of the implied covenant of good faith and fair dealing and promissory estoppel where contract stated it "shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania")).  Whether Mr. Pinther's claims are governed by the contract's choice of law provision depends on the scope of the language, the parties' intent, and the substance of the factual allegations.

[¶12]   The ANPAC Agreement states that its "**validity, construction, and performance** . . . shall be controlled by and construed under the laws of the State of Missouri." (Emphasis added.)  Like Wyoming, Missouri looks to the language of the choice of law provision to determine whether the parties intended extra-contractual claims to be governed by the contract.  *See Farmers Exch. Bank v. Metro Contracting Servs., Inc.*, 107 S.W.3d 381, 393 (Mo. Ct. App. 2003) (while contractual choice of law provision "would govern in the underlying contractual dispute between the parties as to the breach of the . . . notes, it does not extend to the postjudgment dispute here . . .").  In a parallel analysis in *Jitterswing v. Francorp*, the Missouri Court held a narrow forum selection clause did not extend to a tort claim:

> However, the existence of a forum selection clause in a contract that requires contractual disputes to be litigated in a specific forum, does not require tort claims between the same parties to be litigated in that forum absent precise language to that effect. *Service Vending Co. v. Wal-Mart Stores, Inc.*, 93 S.W.3d 764, 768 (Mo. App. S.D. 2002).  Further, a forum selection clause in a contract does not control the site for litigation of a tort claim simply because the dispute that produced the tort claim would not have arisen absent the existence of a contract. *Id.* at 769.

*Jitterswing, Inc. v. Francorp, Inc.*, 311 S.W.3d 828, 830 (Mo. Ct. App. 2010).  Later in *Thieret Family v. Delta Plains Services*, the court contrasted the narrow clause in

4

*Jitterswing* with the broadly drafted language in *Thieret* to determine whether a forum selection clause governed extra-contractual claims:

> In *Jitterswing*, we held that the following forum selection clause in the parties' franchise development program agreement did not apply to the plaintiff's statutory tort claim for the practice of law without a license . . . : "[T]he parties agree that any dispute arising under this Agreement shall be resolved in the state or federal courts, within the state of Illinois, and each party expressly consents to jurisdiction therein." 311 S.W.3d at 830.
>
> .    .    .
>
> [T]he forum selection clause in *Jitterswing* was much narrower than that in this case, as the *Jitterswing* clause only governed "any dispute arising under this Agreement." *Id.* Thus, we held that this clause "was not specific enough to encompass the tort claim for the practice of law without a license." *Id.* at 831. In contrast, the Forum Selection Clause in this case governs "[a]ny lawsuit or litigation arising under, out of, in connection with, or in relation to this Agreement, any amendment hereof, or the breach hereof . . . ." Thus, because the Forum Selection Clause not only encompassed claims "arising under" the subject agreement (like in *Jitterswing*), but also included claims "[arising] out of," "in connection with," or "in relation to" the subject agreement, its reach is far greater than the forum selection clause in *Jitterswing*. Accordingly, we conclude that even if Appellants' fraudulent inducement claims do not "arise under" the Finance Agreements, they certainly "[arise] out of," are "connect[ed] with," and "relat[e] to" the Finance Agreements. In short, we find that this language in the Forum Selection Clause was broad enough to encompass Appellants' common law fraudulent inducement claims under the specific facts of this case.

*Thieret Fam., LLC v. Delta Plains Servs., LLC*, 637 S.W.3d 595, 606–07 (Mo. Ct. App. 2021) (emphasis omitted).

[¶13] Mr. Pinther's claims for breach of contract and breach of the covenant of good faith and fair dealing concern the "validity, construction, and performance" of the ANPAC Agreement and, pursuant to the agreement, Missouri law applies. The narrow language of the ANPAC Agreement does not encompass Mr. Pinther's claims for fraudulent

inducement, tortious interference with contract, or civil conspiracy.[4] These claims do not arise out of the contract, and the law of the state with the most significant relationship to the transaction and parties governs. To determine the most significant relationship to a tort issue, courts look to:

> (a)     the place where the injury occurred,
> (b)     the place where the conduct causing the injury occurred,
> (c)     the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d)     the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145 (Am. Law Inst. 1971). Here, Mr. Pinther was given the brochure in Wyoming, signed the ANPAC Agreement in Wyoming, and performed his work in Wyoming. The complaints and reporting of complaints arose from his activities in Wyoming. Wyoming law applies to Mr. Pinther's claims for fraudulent inducement, tortious interference, and civil conspiracy.

### *STANDARD OF REVIEW*

[¶14]   Notwithstanding the application of Missouri law to some claims and Wyoming law to others, "Wyoming law applies to procedural matters including the standard of review." *LFP Consulting, LLC v. Leighton*, 2024 WY 12, ¶ 8, — P.3d —, — (Wyo. 2024) (citing *Denbury Onshore, LLC v. APMTG Helium LLC*, 2020 WY 146, ¶ 24, 476 P.3d 1098, 1105 (Wyo. 2020)). A district "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." W.R.C.P. 56(a). "We review a district court's order granting summary judgment de novo and may affirm on any basis in the record." *W. Am. Ins. Co. v. Black Dog Consulting Inc.*, 2023 WY 109, ¶ 7, 538 P.3d 973, 975–76 (Wyo. 2023); *Gates v. Mem'l Hosp. of Converse Cnty. - Advanced Med. Hometown Care by & through Bd. of Trustees of Mem'l Hosp. of Converse Cnty.*, 2023 WY 77, ¶ 14, 533 P.3d 493, 498 (Wyo. 2023); *Primrose Ret. Cmtys., LLC v. Ghidorzi Constr. Co., LLC*, 2023 WY 15, ¶ 8, 523 P.3d 1219, 1224 (Wyo. 2023).

> We review a summary judgment in the same light as the district court, using the same materials and following the same standards. We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. A material fact is one which, if proved,

---

[4]ANPAC does not dispute that Wyoming law could apply to the fraudulent inducement claim. Mr. Maggard only cites Wyoming law.

would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties.

*W. Am. Ins.*, ¶ 7, 538 P.3d at 975–76 (quoting *Gates*, ¶ 14, 533 P.3d at 498–99).

### I.    *Did the district court err in granting summary judgment on Mr. Pinther's breach of contract claim against ANPAC?*

[¶15]  Mr. Pinther contends that the Post-Termination Compensation Schedule was not attached to the ANPAC Agreement, and he did not sign the Post-Termination Compensation Schedule.  As a result, he asserts it violates the statute of frauds and is unenforceable.  He also argues that he had the right to receive commissions as described in the recruiting brochure after the contract was terminated.

[¶16]  We first address the argument that the statute of frauds bars application of the Post-Termination Compensation Schedule.  Under Missouri law, to be enforceable, contracts that are to be performed over more than a year must be in writing and signed by the parties:

> No action shall be brought . . . upon any agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person by him thereto lawfully authorized . . . .

Mo. Ann. Stat. § 432.010 (West 2023).

[¶17]  "Whether a writing satisfies the statute of frauds is a question of law." *Pecos I, LLC v. Meyer*, 655 S.W.3d 579, 589 (Mo. Ct. App. 2022) (quoting *Johnson v. Cook*, 167 S.W.3d 258, 262 (Mo. Ct. App. 2005)).

> "In Missouri, matters incorporated into a contract by reference are as much a part of the contract as if they had been set out in the contract in haec verba." [*Dunn Indus. Group, Inc. v.*] *City of Sugar Creek*, 112 S.W.3d [421,] 435 n.5 [(Mo. 2003)].  This is true as long as the intent to incorporate is clear and the incorporating contract makes a plain, explicit reference to and adequately identifies the incorporated document. *See State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798, 810–11 (Mo. banc 2015).

*Bridgecrest Acceptance Corp. v. Donaldson*, 648 S.W.3d 745, 752 (Mo. 2022), *as modified* (Aug. 30, 2022).  Missouri courts have long held that "where the terms of an agreement

are supplied by an unsigned document, the signatures of the party to be charged may be found in a separate writing, provided that one document expressly or explicitly incorporates the other by reference." *Arnold v. Broadmoor Dev. Co.*, 585 S.W.2d 564, 566 (Mo. Ct. App. 1979) (citing *Aurora Water Co. v. City of Aurora*, 129 Mo. 540, 31 S.W. 946 (1895); *Blue Valley Creamery Co. v. Consol. Prods. Co.*, 81 F.2d 182, 187–88 (8th Cir. 1936)); *see also Pecos I*, 655 S.W.3d at 589 ("When separate documents are relied on to establish the existence of an agreement, they must be connected by express reference to one another or by clear implication established through their respective contents." (quoting *Mayer v. King Cola Mid-Am., Inc.*, 660 S.W.2d 746, 748 (Mo. Ct. App. 1983))); *Intertel, Inc. v. Sedgwick Claims Mgmt. Servs., Inc.*, 204 S.W.3d 183, 196 (Mo. Ct. App. 2006) ("[T]he parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document, including a separate agreement to which they are not parties, and including a separate document which is unsigned." (quoting 11 Samuel Williston, *Treatise on the Law of Contracts* § 30.25, at 232–34 (Richard A. Lord ed., 4th ed. 1990))).

[¶18] The language of the ANPAC Agreement states, "The Post-Termination Compensation Schedule is attached and incorporated herein." This language unambiguously incorporates the Post-Termination Compensation Schedule and the fact that the Post-Termination Compensation Schedule was not separately signed does not cause it to run afoul of Missouri's statute of frauds.

[¶19] Mr. Pinther next argues that even if the Post-Termination Compensation Schedule was incorporated into the ANPAC Agreement, it does not apply to him not only because it was not attached, but also because he did not receive a copy of the schedule.[5] We assume, for the purposes of our summary judgment analysis, that Mr. Pinther did not receive the Post-Termination Compensation Schedule. Whether or not Mr. Pinther received it is not

---

[5] He submits that the language contained in the recruiting brochure ought to govern his post-termination compensation from ANPAC. He further argues that his compensation could only be forfeited if he had committed an act that materially prejudiced ANPAC.

> The ANPAC Agreement states:
> > COMPENSATION AFTER TERMINATION
> > Payments will be made monthly to qualified Agents as specified in the Post-Termination Compensation Schedule. If you [the Agent] have violated any of the provisions of this Agreement or acted to prejudice materially the interests of [ANPAC] at, before, or after termination of this Agreement, you shall forfeit all commissions and all other compensation due or to accrue under this or any previous Agreement between you and [ANPAC].

To make this argument, Mr. Pinther disregards the first sentence and focuses on the second. Mr. Pinther's reliance on this language, and his argument that it does not apply to him, do not advance his cause. This portion of the ANPAC Agreement identifies the circumstances under which no post-termination compensation will be paid. There is no dispute that Mr. Pinther has received compensation calculated under the terms of the Post-Termination Compensation Schedule, as described in the first sentence.

8

dispositive. "Missouri has long recognized that a person signing an agreement has a duty to read it." *Lopez v. GMT Auto Sales, Inc.*, 656 S.W.3d 315, 321 (Mo. Ct. App. 2022) (quoting *Farmland Indus., Inc. v. Bittner*, 920 S.W.2d 581, 584 (Mo. Ct. App. 1996)). "Missouri law presumes that a party had knowledge of the contract he or she signed; and those who sign a contract have a duty to read it and may not avoid the consequences of the agreement on the basis that they did not know what they were signing." *Id.* at 321 (quoting *Bertocci v. Thoroughbred Ford, Inc.*, 530 S.W.3d 543, 553 (Mo. Ct. App. 2017)). The document, attached or not, was incorporated by express reference to the agreement signed by Mr. Pinther. "Matters incorporated into contract by reference are as much a part of the contract as if they had been set out in the contract *in haec verba*." *Intertel*, 204 S.W.3d at 196 (citing *Lacey v. State Bd. of Registration for the Healing Arts*, 131 S.W.3d 831, 839 (Mo. Ct. App. 2004), *as modified* (Apr. 27, 2004)). The Post-Termination Compensation Schedule is part of the Agreement and Mr. Pinther is presumed to have knowledge of it. His contention that he did not receive it is immaterial.

[¶20] The ANPAC Agreement, including the incorporated Post-Termination Compensation Schedule, governed Mr. Pinther's compensation after his relationship with ANPAC had been terminated. There is no dispute that Mr. Pinther has received compensation calculated pursuant to that schedule. The district court properly granted summary judgment on his breach of contract claim against ANPAC.

## II. Did the district court err in granting summary judgment on Mr. Pinther's claim for breach of the covenant of good faith and fair dealing against ANPAC?

[¶21] Mr. Pinther argues that ANPAC breached the implied covenant of good faith and fair dealing. Mr. Pinther alleges ANPAC acted in bad faith by failing to inform him of complaints against him, and "secretively enlist[ing] the help of the Maggards to build a file against" him "to 'justify' the without cause termination" of his ANPAC Agreement.

[¶22] In Missouri, when contracts between insurance companies and their agents provide that the relationship can be terminated without cause upon written notice, "whether labeled an independent contractor or employee, the [insurance company-agent] relationship and termination of it is governed by general principles enunciated in [Missouri's] at-will doctrine cases." *Bishop v. Shelter Mut. Ins. Co.*, 129 S.W.3d 500, 506 (Mo. Ct. App. 2004). Under Missouri's application of the at-will employment doctrine, "the reason for an employee's termination is inconsequential and irrelevant, unless the firing violates a statute or public policy." *Bishop*, 129 S.W.3d at 506 (citing *Emerick v. Mut. Benefit Life Ins. Co.*, 756 S.W.2d 513, 522 (Mo. 1988); *Dake v. Tuell*, 687 S.W.2d 191, 193 (Mo. 1985); *Costello v. Shelter Mut. Ins. Co.*, 697 S.W.2d 236, 237 (Mo. Ct. App. 1985)).

> "Missouri law concerning at will employees may not be circumvented by an employee who alleges a contract of good faith and fair dealing between the employer and employee."

9

*Neighbors v. Kirksville College of Osteopathic Medicine*, 694 S.W.2d 822, 824[2] (Mo. App. 1985).

> . . . [T]he Missouri employment at-will doctrine expressly prohibits any consideration of the *implied* covenant of good faith and fair dealing (inherent in all contracts) *when an employer is sued for terminating the employee.* This follows because the implied covenant cannot be used to contradict or override the *express* employment terms contained in a contract, i.e., that an employee can be terminated for any cause. When a contract does not provide a definite period for employment and fails to include provisions related to reasons for termination, the good faith and fair dealing covenant cannot be implied to supersede the express agreement that the employee can be fired without cause.

*Bishop*, 129 S.W.3d at 506.

[¶23] In *Bishop*, Shelter Mutual Insurance Company (Shelter) terminated its agency contract with one of its agents. *Bishop*, 129 S.W.3d at 502. The agent sued Shelter, alleging, among other things, a claim for breach of the covenant of good faith and fair dealing. *Id.* On appeal, the agent argued "that although [Shelter] would ordinarily have had the right to terminate his contract for cause, or for no cause, without incurring liability, [the agent] could avoid that rule by alleging facts, which if proven, would establish [Shelter] breached an implied duty of good faith and fair dealing." *Id.* at 506. The court held that the agent's "argument runs counter to Missouri law." *Id. See also Kelly v. State Farm Mut. Auto. Ins. Co.*, 218 S.W.3d 517, 524 (Mo. Ct. App. 2007) ("there can be no claim for the breach of an implied covenant of good faith and fair dealing in the termination of an at-will employment relationship").

[¶24] Here, as in *Bishop*, the ANPAC Agreement provides that either party can terminate it without cause upon 30-days' written notice. A claim for breach of the covenant of good faith and fair dealing cannot lie in these circumstances. The district court properly granted summary judgment on this claim.

### III.    *Did the district court err in granting summary judgment on Mr. Pinther's fraudulent inducement claim against ANPAC?*

[¶25] Mr. Pinther argues that there are sufficient disputed facts to submit his fraudulent inducement claim against ANPAC to a jury. In order to prevail on a claim for fraudulent inducement, Mr. Pinther must show, by clear and convincing evidence, that 1) ANPAC made a false representation intending to induce action by Mr. Pinther; 2) Mr. Pinther reasonably believed the representation to be true; and 3) Mr. Pinther suffered damages in

relying on the false representation. *Positive Progressions, LLC v. Landerman*, 2015 WY 138, ¶ 23, 360 P.3d 1006, 1015 (Wyo. 2015). "Clear and convincing evidence is the 'kind of proof which would persuade a trier of fact that the truth of the contention is highly probable.'" *Id.* (quoting *Alexander v. Meduna*, 2002 WY 83, ¶ 29, 47 P.3d 206, 216 (Wyo. 2002)). While clear and convincing evidence generally is not required to withstand a motion for summary judgment,

> [w]hen determining if a genuine issue of material fact exists regarding a claim of fraud, [the court] must bear in mind the actual quantum and quality of proof necessary to support liability. In ruling on a motion for summary judgment, "the [court] must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). "[T]here is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find [fraud] by clear and convincing evidence." *Id.* *See also Richardson v. Hardin*, 5 P.3d 793, 797 (Wyo. 2000).

*Lee v. LPP Mortg. Ltd.*, 2003 WY 92, ¶ 12, 74 P.3d 152, 158 (Wyo. 2003).

[¶26] Mr. Pinther asserts that he was fraudulently induced into entering the ANPAC Agreement by the recruiting brochure which said, "All first-year and renewal commissions are vested . . . and continue as long as renewal commissions are paid . . . . There is no retirement age." This statement appears in the brochure under a subheading entitled "American National."[6] Immediately following this paragraph, is a separate subheading entitled "ANPAC®." Under the ANPAC subheading, retirement benefits are described as compensation that takes the form of a "[l]ifetime annuity, either single life or joint survivor based on lifetime loss ratio, length of service, and average compensation over the last 60 months."

[¶27] The language that Mr. Pinther relies on addresses the retirement benefits offered by ANICO, not ANPAC. The recruiting brochure language for ANPAC is consistent with the Post-Termination Compensation Schedule incorporated in the ANPAC Agreement.

[¶28] The recruiting brochure unambiguously states that it is "for recruiting purposes only," and the ANPAC Agreement provides that it is "the sole agreement and supersedes all prior Agreements" between Mr. Pinther and ANPAC. The district court properly determined that Mr. Pinther cannot establish that the statements in the recruiting brochure

---

[6]As discussed *supra*, ANPAC and ANICO are separate companies and Mr. Pinther separately contracted with each of them.

11

were false or that he reasonably relied on the ANICO retirement sections to the exclusion of the ANPAC retirement sections of the brochure.

[¶29] Even if Mr. Pinther could prove a misrepresentation based upon the recruiting brochure's language, once he received the ANPAC Agreement, he could no longer rely on the mistaken belief that the brochure governed his agreement with ANPAC. The ANPAC Agreement put Mr. Pinther on notice that post-termination payments would be based on the Post-Termination Compensation Schedule. *See Fleig v. Est. of Fleig by & through Fleig*, 2018 WY 30, ¶ 12, 413 P.3d 638, 642–43 (Wyo. 2018) ("'One who signs a contract generally cannot avoid it on the ground that he did not attend to its terms, or did not read it, or supposed that it was different in its terms, or that he took someone's word as to what it contained.' Further, when a signed contract incorporates by reference another document, that document becomes part of the contract even when it is not separately signed." (citations omitted)).[7]

[¶30] The district court properly concluded that Mr. Pinther could not establish a fraudulent inducement claim against ANPAC. *See Dewey v. Wentland*, 2002 WY 2, ¶¶ 17–18, 38 P.3d 402, 411 (Wyo. 2002) (affirming summary judgment on fraudulent inducement claim where plaintiffs could not establish reliance upon a misrepresentation when their inspection of the property revealed contradictory facts); *White v. Ogburn*, 528 P.2d 1167, 1171 (Wyo. 1974) (dismissing fraudulent misrepresentation claim because plaintiffs "could not blind themselves to observe the readily available facts and place reliance upon . . . alleged misrepresentations without making a diligent inquiry of these facts").

### IV. *Did the district court err in granting summary judgment on Mr. Pinther's tortious interference with contract claim against Mr. Maggard?*

[¶31] Mr. Pinther asserts that his claim against Mr. Maggard for tortious interference with contract should be decided by a jury. He argues that Mr. Maggard and his wife were in competition with Mr. Pinther, and Mr. Maggard's reports of customer complaints interfered with Mr. Pinther's ANPAC Agreement.

[¶32] "It has long been the rule in [Wyoming] that a claim for intentional interference with contract cannot survive if it involves an assertion that an agent for one party to the contract interfered with it." *Excel Constr., Inc. v. HKM Eng'g, Inc.*, 2010 WY 34, ¶ 21, 228 P.3d 40, 46 (Wyo. 2010). "[R]eason dictates that an action of wrongful interference directed against an employee or an agent of one of the parties to the contract must merge into any

---

[7] Under Missouri law, the result would be the same. *See DiSalvo Properties, LLC v. Hall*, 616 S.W.3d 502, 507 (Mo. Ct. App. 2020) (Missouri elements of fraudulent inducement include false representation and plaintiff's reliance on the representation); *Scott Salvage Yard, LLC v. Gifford*, 382 S.W.3d 134, 137 (Mo. Ct. App. 2012) (same).

action for breach of the contract because the act of the agent must be attributed to the principal." *Dynan v. Rocky Mountain Fed. Sav. & Loan*, 792 P.2d 631, 641 (Wyo. 1990).[8]

[¶33] Mr. Pinther argues that because one could infer "cut-throat-competition emerges among agents," his tortious interference claim should survive summary judgment. He contends that Mr. Maggard had a motive to eliminate competition for his own gain and benefitted from Mr. Pinther's termination.[9] Mr. Pinther's unsubstantiated theories about Mr. Maggard's motive for reporting complaints are not relevant. When reporting complaints about Mr. Pinther, Mr. Maggard was acting at the request of his supervisor, Mr. Gniady. Mr. Pinther has produced no facts to the contrary. Mr. Maggard's actions are imputed to ANPAC and cannot form the basis for a separate tortious interference with contract claim. *See Excel*, ¶ 21, 228 P.3d at 46; *Farrow v. Saint Francis Med. Ctr.*, 407 S.W.3d 579, 602 (Mo. 2013).

[¶34] The district court correctly granted summary judgment to Mr. Maggard on Mr. Pinther's claim for tortious interference with contract.

## V. Did the district court err in granting summary judgment on Mr. Pinther's civil conspiracy claims against ANPAC and Mr. Maggard?

[¶35] Mr. Pinther rests his civil conspiracy claims on a purported agreement between Mr. Gniady and Mr. Maggard "to build a file of alleged complaints about [him] without his knowledge thereby preventing him [from] either refut[ing]or address[ing] them." On appeal, he argues there are genuine issues of material fact as to whether the alleged conduct was wrongful.

[¶36] To state a claim for civil conspiracy, a plaintiff must state an underlying cause of action in tort. *Action Snowmobile & RV, Inc. v. Most Wanted Performance, LLC*, 2018 WY 89, ¶ 16, 423 P.3d 317, 324 (Wyo. 2018). *See also Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo. 1996) ("In Missouri, if tortious acts alleged as elements of a civil conspiracy claim fail to state a cause of action, then the conspiracy claim fails as well." (citing *Williams v. Mercantile Bank of St. Louis NA*, 845 S.W.2d 78, 85 (Mo. Ct. App. 1993))); *Hibbs v. Berger*, 430 S.W.3d 296, 320 (Mo. Ct. App. 2014) ("If the underlying wrongful act alleged as part of a civil conspiracy fails to state a cause of action, the civil conspiracy claim fails

---

[8] Missouri law is similar. In Missouri, "[a]n action for tortious interference with a business expectancy will lie against a third party only. Where the individual being sued is an officer or agent of the defendant corporation, the officer or agent acting for the corporation is the corporation for purposes of tortious interference." *Farrow v. Saint Francis Med. Ctr.*, 407 S.W.3d 579, 602 (Mo. 2013) (quoting *Zipper v. Health Midwest*, 978 S.W.2d 398, 419 (Mo. Ct. App. 1998)); *see also Nickel v. Stephens Coll.*, 480 S.W.3d 390, 399 (Mo. Ct. App. 2015).

[9] The facts in the record belie Mr. Pinther's assertions. It is undisputed that during Mr. Pinther's time as an agent, Mr. Maggard received commissions associated with Mr. Pinther's book of business and that these commissions decreased when Mr. Pinther's ANPAC Agreement was terminated.

as well." (quoting *Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 586 (Mo. Ct. App. 2008))). Wyoming and Missouri law yield the same outcome. As discussed above, none of Mr. Pinther's tort claims against ANPAC and Mr. Maggard survived summary judgment. As a result, there is no basis for his civil conspiracy claims.[10] The district court properly granted summary judgment on Mr. Pinther's civil conspiracy claims against ANPAC and Mr. Maggard.

### *CONCLUSION*

[¶37]   There are no genuine issues of material fact regarding any of the claims asserted by Mr. Pinther. The district court properly granted summary judgment in favor of ANPAC and Mr. Maggard. Affirmed.

---

[10] Mr. Pinther asserted claims against ANPAC for breach of the covenant of good faith and fair dealing and for fraudulent inducement. Those claims do not survive summary judgment. *Supra* ¶¶ 21–30. Mr. Pinther's sole claim (other than for civil conspiracy) against Mr. Maggard was for tortious interference with contract. That claim, too, fails as a matter of law. *Supra* ¶¶ 31–34.